Caryl CHESSMAN, Petitioner,

v.

Fred R. DICKSON, Warden, Vice Harley O. Teets, Warden, California State Prison, San Quentin, California, Respondent.

No. 16766.

United States Court of Appeals
Ninth Circuit.

Feb. 8, 1960.

George T. Davis, San Francisco, Cal., Rosalie S. Asher, Sacramento, Cal., A. L. Wirin, Los Angeles, Cal., Caryl Chessman, San Quentin, Cal. (in pro. per.) for appellant.

·Stanley Mosk, Atty. Gen., Arlo E. Smith, Deputy Atty. Gen., State of California, for appellee.

CHAMBERS, Chief Judge.

Chessman is under two death sentences and execution by the State of California will be had on February 19, 1960, unless someone stays it.

Primarily the case is the state's business, but when asked by a habeas corpus petition the federal statutes and United States Supreme Court require the United States district and circuit judges to look into such cases, primarily to see that due process has been had.

On or about June 25, 1948, Chessman was convicted by a jury of 17 counts of 18 counts in two informations. On each of two counts the jury, as permitted by the California statutes, imposed the penalty of death.

Three of the counts (death penalty for one) concern events of a revolting attack he made on January 19, 1948, at or near Los Angeles on a young woman named Regina (last name omitted) and three (also death penalty for one) concern an equally revolting attack made on January 22, 1948, on a young woman named Mary (last name omitted). The death sentences were possible under California statutes because of the element in the case of each girl of kidnapping for the purpose of robbery. A sexual perversion orgy with Chessman was forced on both women at the point of a gun.

But on habeas corpus Chessman says we have no right to know this because he claims there never has been an adequate transcript of the evidence at the trial and thus, he says, we cannot use the usual rule that on appeal after conviction the testimony is taken in the most favorable light in favor of the state (here the People of California).

Due to the exigencies of time the full story of Chessman's many legal excursions cannot be here fully reported. Therefore, for completeness of facts this opinion must assume a familiarity with the following three cases: People v. Chessman, 38 Cal.2d 166, 238 P.2d 1001; Chessman v. Teets, 354 U.S. 156, 77 S.Ct. 1127, 1 L.Ed.2d 1253, and People v. Chessman, 52 Cal.2d 467, 341 P.2d 679.

It should be recited that one reporter Perry took shorthand notes on the original state trial at Los Angeles before the jury. He was about a fourth or a third through transcribing when he died.

Then another shorthand reporter Fraser was employed to finish the transcription. The prosecutor and the trial judge, Charles W. Fricke, played some role in the settlement of the proposed transcript and the record was submitted to Chessman in his prison cell in San Quentin, California. He made certain suggestions for correction, some of which were adopted and some rejected. The transcript was then settled by Judge Fricke. On the automatic appeal required by California, the California Supreme Court in People v. Chessman, 38 Cal.2d 166, 238 P.2d 1001, cited supra, held the procedure and the result were adequate and affirmed the conviction. Eventually the United States Supreme Court in Chessman v. Teets, 354 U.S. 156, 77 S.Ct. 1127, 1 L.Ed.2d 1253, cited supra, held that the transcript so settled was improper: that under the circumstances Chessman was entitled to a hearing on the transcript. Thereupon, the California Supreme Court vacated its affirmance and a hearing ran intermittently over a period of six weeks with Chessman present before Judge Walter R. Evans of the superior court at Los Angeles who presided. Thus, a new transcript was completed for the purposes of appeal. Generally, it may be said that Judge Evans leaned over backwards in granting Chessman's requests for changes in the transcript. (We also have a third transcript, being the transcript of the hearing to settle the transcript.) The resettled transcript went forward to the California Supreme Court and it again affirmed the conviction, People v. Chessman, 52 Cal.2d 467, 341 P.2d 679, cited supra.

The great hole in Chessman's position is that under the first (Fricke) transcript and the second (Evans) transcript, and under such a transcript as we might have if we accepted all of the rest of his specific trifling objections to this and that in the record, he cannot get away, cannot shake the simple, vulgar, violent story of what he did to Regina and Mary.

At the hearing on February 5, counsel for Chessman were asked to state the story of the events concerning the two girls according to the last (Evans) transcript. This they declined to do. Thereupon, it was necessary to ask counsel for the warden to do it. Counsel for the warden stated it in all of its unlovely details pursuant to my insistence. That statement is appended hereto for the permanent record. Counsel's assertion that the story would be the same under either the Evans or Fricke transcripts was not questioned. And after extensive examination of the transcript of the resettlement proceedings, I am convinced the story would always be the same—unless Chessman can void the whole transcript as resettled. To this, counsel for Chessman virtually agreed.

At the Evans resettlement hearing there was testimony that Fraser, the transcriber, who finished up for the dead Perry, was incompetent mentally and technically. Thus Judge Evans could have voided all effort to produce a transcript, but on an issue of fact he concluded that a fair transcript could be produced. And one eventuated.

Recently on a supplemental petition for habeas corpus at a hearing thereon before the Chief Judge of the United States District Court for the Northern District of California in San Francisco, Chessman made a broadside attack on the ultimate Evans transcript. And even there he attempted to impeach with further evidence the character and work of Fraser. Such evidence was rejected together with all other legal contentions.

Chessman seeks to appeal to our Court from the decision denying him the great writ. Before he can do so, he must get a certificate of probable cause for appeal. If granted, it would necessarily follow that a stay of his impending execution should also be entered. His applications for such orders were before the aforementioned chief judge of the district court who rejected them. Now such applications are before me.

■ If there is any substance at all to Chessman's contentions in his last petition before the district court, I must grant the certificate. The test is not

whether I might ultimately agree with the contentions.

■ While I shall list most of the contentions and make some brief observations, at the threshold, I now state, in my view, the petitioner has just run out of points. Petitioner is represented by able counsel and one must give them a grade of "A" for ingenuity, but such ingenuity just doesn't put water in the bottom of the well where there is none.

Seriatim below are listed the purported issues raised by Chessman, together with my answers:

1. That the chief judge of the district court misconstrued the Supreme Court's mandate. See 354 U.S. 156, 77 S.Ct. 1127, 1 L.Ed.2d 1253. Answer: The district court properly construed the mandate. It was not required to do anything more than see that California gave Chessman a hearing on the transcript. It did.

2. That at the district court hearing Chessman was not permitted to produce evidence to attack the transcript and to show the prejudice of Justice Schauer of the Supreme Court of California. Answer: Chessman had a fair hearing before Judge Evans on the transcript. Judge Evans suffered with patience and interminably all sorts of irrelevancies and worse, at Chessman's hands. As to Justice Schauer, I do not believe he has to be tried for his alleged prejudices.

3. That the law under which the death sentences were imposed was repealed before the California judgment was final. Answer: This has no merit and is adequately answered in the opinion in 341 P.2d 679.

4. That the last proceedings in district court were commenced before the official state records were available. Answer: If the records were needed, they were available before the hearing was completed.

5. That at the last proceedings in district court Chessman was not permitted to represent himself and also have counsel represent him. Answer: He was permitted to take his choice. He chose to represent himself with counsel at his side for advice. There is nothing wrong with this.

6. That at the last district court hearing he was not permitted to call Arlo Smith, deputy attorney general, as a witness. Answer: There was no reason to call Mr. Smith as a witness.

7. That at the last hearing he was not permitted to call other witnesses and subpoenas were quashed. Answer: There just was no triable issue of fact.

8. That at the last hearing the chief district judge refused to examine Chessman's cell. Answer: There was no reason to examine the cell.

9. That at the last hearing the chief district judge refused to answer certain questions asked by Chessman. Answer: The questions required no answer.

10. That at the last hearing the chief district judge refused to appoint a shorthand expert to examine the Evans transcript. Answer: The transcript was not being retried and there was no right to a retrial.

11. That at the last hearing the district judge erred in failing to release Chessman because he has been confined in a death cell for eleven and one-half years, thus he has been subjected to cruel and unusual punishment. Answer: It may show a basic weakness in our government system that a case like this takes so long, but I do not see how we can offer life (under a death sentence) as a prize for one who can stall the processes for a given number of years, especially when in the end it appears the prisoner never really had any good points. If we did offer such a prize, what year would we use as a cutoff date? I would think that the number of years would have to be objective and arbitrary.

But counsel for petitioner suggest that we take a subjective approach on this man's case. We are told of his agonies on death row. True, it would be hell for most people. But here is no ordinary man. In his appearances in court one sees an arrogant, truculent man, the same qualities that Regina and Mary met, spewing vitriol on one person after an-

other. We see an exhibitionist who never before had such opportunities for exhibition. (All this I get from the record.) And, I think he has heckled his keepers long enough.

It is true that the chief judge of the district court, after turning his back on the contention of cruel and unusual punishment, then turned sideways and suggested that the governor of California and the California Supreme Court should consider this long incarceration as a ground for commutation of sentence, thus tangentially endorsing what as a judge he had rejected. The California Supreme Court and California's governor have a legitimate role in commutation. We have none.

The district judge's remarkable digression begins with, "However, extra-judicially * speaking, * * * " This is where he should have stopped.

Perhaps I should not chide the judge for abandoning his robe. Perhaps he has already received his own reward. The application before me, over Chessman's own signature, says of what the judge did: "This is not due process; it is tyranny." Also, in papers before me, Chessman says (over his sole signature) of the same proceedings where the same district judge attempted to throw him a lifeline: "The district court in a manner lethally adverse to (me)", etc.

In sum, Chessman is entitled to due process. He has had it in full measure.

Based upon the foregoing considerations, I decline to issue a certificate of probable cause or stay the execution.

### Appendix "A"

(Extract from colloquy between court and counsel at hearing on February 5, 1960.)

"Mr. Smith: The facts involved in the two counts were as follows: As to Mrs. J———, she was riding in the hills around Los Angeles———

"The Court: You are stating this according to the ultimate transcript, the Evans transcript?

"Mr. Smith: Yes, sir. ———with a chap named Jarnigan Lee. They were parked overlooking the city. They were approached by an automobile and a red light flashed on. Then they immediately thought this was a police car. However, a person that was identified as Mr. Chessman got out of the car and approached with a handkerchief over his face and he had a gun. Mr. Lee was familiar with firearms. He said that the gun was fully cocked and he heard it click past the safety positions and at the same time Chessman said, "Don't move or I will kill the both of you." As to Lee's wallet, he was asked for it and was given it. He also demanded the rings and purse of the woman, Mrs. J———. He then requested Mrs. J——— to get out of the car and proceed to his own on up the hill. And at this time, Mr. Lee protested that she had just gotten out of the hospital from an attack of infantile paralysis and please have mercy on Mrs. J———. Mr. Chessman replied that, 'Knock it off, they will take you away in a coffin.' And then later on he said, 'If you give me any trouble you will be hauled away in a casket,' and continued to threaten him in like fashion.

"He thereupon threatened Mr. Lee, if he got out of the car he would be carried away in a casket. Mrs. J——— got out of the car, went to the car of Mr. Chessman. She of course was partially paralyzed, she couldn't walk too easily so Mr. Chessman helped her out. In the

---

* The volunteered statement was as follows: "However, extra-judicially speaking, the appeal [cruel and unusual punishment] of the petitioner in this regard is impressive. It may be that this contention of petitioner, as well as his claim with respect to the effect of the amendment to California Penal Code Section 209, may well be asserted to the Governor and the Supreme Court of California, under their clemency powers."

(From page 99 of transcript of hearing held by the chief judge of the district court on January 28 and 29, 1960.)

The vice of the unnecessary statement is compounded, where there was no duty to speak, because it invades the delicate field of state and federal relations. Of course, without one's official position, the currency of the statement would be of little worth.

car Mr. Chessman demanded that she submit herself to sexual relationships. She complained she was then menstruating. Mr. Chessman said, 'All right, then blow it,' ordering and forcing her at the point of a gun to commit an act of oral copulation. Later on, she was released from the car and given the keys and of course returned to the car, weeping and in an hysterical state of mind.

"All during this proceedings there were continued threats that he would kill Mrs. J——— or Mr. Lee if he interfered.

"The Court: Did she go through with what he ordered her to do?

"Mr. Smith: Yes, your Honor, at the point of a gun. Let me read you part of the testimony. 'He exposed his private parts to her, his penis, held the gun at the base of her brain and under complaint and under compulsion at the point of a gun and by threats as to her and Lee, he made her use her mouth upon his private parts.'

"The Court: What are you reading from?

"Mr. Smith: From the Peoples Brief in the California Supreme Court, which is a summary of the testimony contained in the transcript presented here.

"The Court: Very well.

"Mr. Smith: During these acts Mr. Lee could hear her pleading with Chessman. He could hear appellant repeatedly threaten to kill her. Lee testified that he had never been so helpless in his life as he was at that time, fearing for her life.

"Now, as to the other count involving Miss M———, she likewise was in a car with one Mr. Hurlbut. They likewise were parked above the city of Los Angeles vicinity. They likewise were approached by Mr. Chessman while they were so parked. Mr. Chessman, like in this instance also, got out of the car, came over to the car in which they were seated, had a handkerchief over his face, produced a gun, said 'This is a stickup,' demanded the wallet, belongings of the parties. Likewise in this instance, Chessman again demanded that Miss M———, who was a girl some 17 years of age, get out of the car, proceed to his own. Hurlbut pleaded with him, of course, not to take the girl to his car. At this time apparently he ordered Hurlbut, under threats of death at the point of a .45, to follow Chessman to a point down the road. Hurlbut got in his car; Chessman got in his, in which the girl, Miss M———, was and—no, it was the other way around. He ordered Hurlbut to proceed in a certain direction, followed by Chessman. Hurlbut decided he would attempt to elude Chessman and notify the police, in order that he might be apprehended. After a brief chase he was successful. Chessman then proceeded into the hills back of Los Angeles for some distance, driving over a considerable period of time and a considerable distance in terms of space. He drove to a very secluded place in those hills and at that time Miss M——— asked Chessman what he was planning to do. He replied, 'You know.' She cried and pleaded with him, asking, 'Why do you do this to me, I have never done anything to you.' She proceeded to cry for five or ten minutes. However, appellant Chessman was in no way fazed by the crying, but simply sat calmly until she finished her crying. Again Miss M———, upon demands by Chessman for her submission to sexual intercourse, complained she also was menstruating, and, however, Chessman demanded that he be shown, whereupon she produced the kotex and the belt. However, this made no difference to Mr. Chessman. He pulled out his private parts and again under threats of her life and at the point of a gun required her to copulate his private parts with her mouth. The act was by force and compulsion of the gun and the threats. Likewise, he was charged with attempted rape at this time, he turned the young girl over and proceeded to commit a rape upon her. And the testimony later of the doctor showed that indeed she was, in terms of common parlance, a virgin. Her hymen was intact, however it had been bruised by the second assault of Chessman when he at-

tempted rape. Really it wasn't full rape, the district attorney had him charged only with attempted rape and the sexual perversion. He thereupon returned Miss M—— somewhere in the vicinity of her house. Of course she immediately reported this, after regaining her composure and being able to arise out of her own hysterical state, complained to her mother and immediately was taken to the police and the medical authorities, as I indicated.

"I think that contains the gist of the testimony on those two counts.

"The Court: Just a minute, Mr. Smith, I am not through. Would you say that is a fair representation of the testimony most favorable to the State, according to the ultimate Evans' transcript?

"Mr. Smith: Yes, your Honor. And of course really if—well, I won't get into that argument. Yes, your Honor.

"The Court: Just a minute now. If you were telling the same story according to the Fricke or original transcript, what variation would you make?

"Mr. Smith: There would be no variations at all, your Honor."