Stanley P. Johnston, Oklahoma City, OK (J.I.M. Caldwell and Craig S. Key, on the brief), for appellant.

Loren A. Unterseher, Minneapolis, MN (Steven D. DeRuyter, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, BEAM, Circuit Judge, and JACKSON,* District Judge.

RICHARD S. ARNOLD, Chief Judge.

This is a bankruptcy case in which Jefferson Lines, Inc., is the debtor. The Oklahoma Tax Commission seeks payment for unpaid sales taxes on the gross price of interstate bus tickets sold in Oklahoma. The applicable

state statute, Okla. Stat. Title 68, § 1354(1)(C), requires Jefferson to collect a sales tax on the gross price of every bus ticket sold in Oklahoma, including tickets for transportation service performed out of state. In an opinion filed last year, we held that the sales tax, as applied to the present situation, was in violation of the Commerce Clause of the United States Constitution, Article I, § 8, cl. 3, and we therefore affirmed a judgment of the District Court disallowing the claim of the Oklahoma Tax Commission. 15 F.3d 90 (8th Cir.1994).

The Supreme Court granted certiorari and has now reversed our judgment. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* —— U.S. ——, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995). That Court's judgment, filed with us on May 26, 1995, reverses the judgment of our Court and remands the case to us "for further proceedings in conformity with the opinion of" the Supreme Court.

Accordingly, we now reverse the judgment of the District Court and remand the case to that Court for further proceedings in conformity with the opinion of the Supreme Court of the United States.

It is so ordered.

**Duncan Peder McKENZIE, Jr., Petitioner–Appellant,**

v.

**Rick DAY, Director, Department of Corrections and Human Services, Respondent–Appellee.**

No. 95–99006.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 1995.

Decided May 8, 1995.

* The Hon. Carol E. Jackson, United States District Judge for the Eastern District of Missouri, sitting by designation.

Timothy K. Ford, MacDonald, Hoague & Bayless, Seattle, WA, for petitioner-appellant Duncan Peder McKenzie.

Pamela P. Collins, Asst. Atty. Gen., Helena, MT, for respondent-appellee Rick Day.

Before: NORRIS, BEEZER and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge.

Duncan Peder McKenzie has been on death row for two decades. In his third federal habeas petition, he claims *inter alia* that the state of Montana's inordinate delay in carrying out his sentence constitutes cruel and unusual punishment, a claim similar to that raised in Texas by Clarence Allen Lackey. *See Lackey v. Texas*, — U.S. —, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (Stevens, J., respecting the denial of certiorari). We will refer to this claim as the "*Lackey* claim."

### Background

The protracted procedural history of this case is a matter of public record and need not be reiterated.[1] Suffice to say that McKenzie's second habeas petition, filed July 27, 1985, was finally disposed of in our court on June 24, 1994, and after the customary petition for rehearing, suggestion for rehearing en banc and petition for certiorari were all rejected, the case was returned to the district court. In February of this year, the district court lifted the stay of execution that had been in place throughout the many years taken up by McKenzie's collateral attacks in federal court.

The state immediately petitioned the state district court to reschedule McKenzie's execution.[2] It was in opposition to that petition, on March 20th,[3] that McKenzie first raised his *Lackey* claim. The state court rejected this and other challenges, holding that it lacked authority to consider any matter other than setting a new execution date. *Montana v. McKenzie*, No. 6593A (Mont.Dist.Ct., Eighth Jud.Dist., Mar. 27, 1995) (transcript of proceedings), at 7, 13; *see* Mont.Code Ann. § 46–19–103(1).[4] That ruling was affirmed by a divided state Supreme Court, *Montana v. McKenzie*, — Mont. —, 894 P.2d 289, 292 (1995); the dissenting justice would have remanded for consideration of the *Lackey* claim, *id.*, 894 P.2d at 293–95 (Leaphart, J., dissenting).

McKenzie then filed this habeas petition in federal district court. In addition to the *Lackey* claim, McKenzie raised the following claims: (1) that changes made to the Montana capital punishment scheme since his conviction in 1975 violated the ex post facto clause because they took away the state trial court's discretion to consider new evidence in mitigation of the sentence; (2) that changes in the method of execution, the number of witnesses permitted to attend, and the place and procedure surrounding the execution violated the ex post facto clause because they increased his punishment; (3) that he was denied due process at the hearing on the state's motion to reset the execution date because he was not given an adequate opportunity to consult with counsel before being required to choose the method of execution, and because he had not been provided with

---

1. *See State v. McKenzie*, 171 Mont. 278, 557 P.2d 1023 (1976), *vacated, McKenzie v. Montana*, 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977), *on remand State v. McKenzie*, 177 Mont. 280, 581 P.2d 1205 (1978), *vacated, McKenzie v. Montana*, 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d 871 (1979), *on remand State v. McKenzie*, 186 Mont. 481, 608 P.2d 428 *cert. denied*, 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (1980), *post-conviction relief denied, McKenzie v. Osborne*, 195 Mont. 26, 640 P.2d 368 (1981), *petition for writ of habeas corpus denied, McKenzie v. Risley*, 801 F.2d 1519 (9th Cir.1986), *reh'g granted, McKenzie v. Risley*, 815 F.2d 1323 (9th Cir.1987), *vacated in part, McKenzie v. Risley*, 842 F.2d 1525 (9th Cir.) (en banc), *cert. denied*, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988), *remand for evidentiary hearing on second petition for writ of habeas corpus, McKenzie v. Risley*, 915 F.2d 1396 (9th Cir.1990), *second petition for writ of habeas corpus denied, McKenzie v. McCormick*, 27 F.3d 1415 (9th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 916, 130 L.Ed.2d 797 (1995).

2. The state filed its motion on January 24, 1995, before the federal stay of execution had been lifted.

3. McKenzie initially objected to the state's motion for a hearing to reschedule his execution on January 26, 1995, but he did not at that time raise his *Lackey* claim; instead, he argued that the motion was premature (because the federal stay was still in effect), and that it was brought under a statute that was not in effect at the time of his crime.

4. At this hearing, the court also exercised its authority under state law to allow McKenzie to choose the method of his execution. *See* Mont. Code Ann. § 46–19–103(3). McKenzie chose lethal injection rather than hanging.

information (including the identity of his executioner) that he needed to make that decision; (4) that he was denied due process by the state's failure to consider new evidence in mitigation of his sentence, including evidence that he was not a violent prisoner and no longer posed a threat to society; (5) that he was denied due process by the state's failure to re-weigh the proportionality of his sentence in light of the subsequent reversal (on grounds of legal error, not insufficiency of the evidence) of the convictions to which his crime had originally been compared; (6) that his execution would amount to cruel, unusual and arbitrary punishment because he will be the first person executed in Montana since 1943 and the only one ever to have been executed under the pre–1977 death penalty statute; and (7) that his death sentence is based on materially inaccurate facts, because changes in Montana law would now allow him to be sentenced to life imprisonment without the possibility of parole, an option not available in 1975 when he was sentenced.

The district court summarily dismissed McKenzie's third habeas petition as "successive and repetitive" without awaiting the state's response. *McKenzie v. Day,* No. CV–95–44–GF (D.Mont. Apr. 20, 1995). We issued a certificate of probable cause and ordered expedited briefing and argument.

### Discussion

McKenzie seeks a stay and a remand to the district court for consideration of various claims, including his *Lackey* claim. In the alternative, McKenzie asks that we simply rule for him on the merits and issue the writ. We consider each of these requests for relief in turn.

### A. The Stay

■ The Supreme Court, in the celebrated case of Robert Alton Harris, held as follows:

> Whether his claim is framed as a habeas petition or § 1983 action, Harris seeks an equitable remedy. Equity must take into consideration the State's strong interest in proceeding with its judgment and Harris' obvious attempt at manipulation. This claim could have been brought more than a decade ago. There is no good reason for this abusive delay, which has been compounded by last-minute attempts to manipulate the judicial process. A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief.

*Gomez v. United States Dist.Ct. for the N.Dist. of Cal.,* 503 U.S. 653, 653–54, 112 S.Ct. 1652, 1653, 118 L.Ed.2d 293 (1992) (citations omitted) [hereinafter referred to as "*Harris*"]. The Supreme Court took pains to explain that it did not vacate the stay of execution for abuse of the writ, *see McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991): "Even if we were to assume . . . that Harris could avoid the application of *McCleskey* to bar his claim, we would not consider it on the merits." *Harris,* 503 U.S. at 653, 112 S.Ct. at 1653. The Court held that Harris was not entitled to the equitable remedy of a stay of execution because of his abusive delay in bringing his claim.[5]

McKenzie, like Harris, seeks a last-minute stay of execution. And, like Harris, he raises claims that could have been brought much earlier, quite possibly as early as his first[6] and second federal habeas petitions.

---

5. The dissent misses the crucial distinction between *McCleskey* and *Harris.* *McCleskey* applies to all successive habeas petitions, regardless of whether they are brought on the eve of execution, indeed regardless of whether they seek relief from a death sentence at all. *McCleskey* therefore covers far broader territory than *Harris,* which applies only to last-ditch efforts to obtain a stay of execution. The dissent also argues we are finding facts on appeal by holding that McKenzie's delay in bringing his claims was abusive. Not so. We are doing precisely what the Supreme Court did—and what it held other federal courts must do—in ruling on a last-min-

ute request for a stay of execution. We seriously doubt the Supreme Court appointed a special master in *Harris* to take evidence about the reasonableness of the delay in that case.

6. The dissent points out that McKenzie could not have raised his *Lackey* claim in 1981, when he filed his first habeas petition. This is true, but McKenzie *could* have moved to amend his first petition to add that claim at any time prior to August 1985, when the petition was finally resolved by the district court. *See Fetterly v. Paskett,* 997 F.2d 1295, 1296–97 (9th Cir.1993).

McKenzie raises several issues in his petition and briefs but bases his request for a stay largely on his *Lackey* claim. While Justice Stevens' memorandum in *Lackey* has given prominence to the argument that delay in carrying out a death sentence constitutes cruel and unusual punishment, the legal theory underlying the claim is not new in this circuit, since a similar claim was raised as early as 1960 by Caryl Chessman. *Chessman v. Dickson,* 275 F.2d 604, 607 (9th Cir. 1960). In 1984, this precise claim was raised in the habeas petition of Willie Lee Richmond, and was rejected by this court on the merits in 1990. *See Richmond v. Lewis,* 948 F.2d 1473 (9th Cir.1990), *rev'd on other grounds,* — U.S. —, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992), *vacated,* 986 F.2d 1583 (9th Cir.1993). While the panel in *Richmond* eventually vacated its opinion, 986 F.2d 1583, rendering its ruling non-binding on us, the fact that the claim was litigated in cases in this circuit shows clearly that the claim was capable of being raised much earlier.[7]

We recognize that McKenzie's claim is unlike Harris' in some respects. For one thing, the *Lackey* theory had been rejected by this court in 1990 and, while that ruling stood as the law of the circuit, it arguably would have been frivolous to raise it.[8] But there was no such bar to litigating the claim before the *Richmond* panel's ruling was entered (in December 1990) or after it was vacated (in March 1993). From 1985 to 1994 McKenzie was in the process of litigating his second federal habeas petition, which occasioned not one but two evidentiary hearings in the district court. *See McKenzie v. Risley,* 915 F.2d 1396, 1397 (9th Cir.1990); *McKenzie v. McCormick,* 27 F.3d 1415, 1417 (9th Cir. 1994). Had McKenzie raised the *Lackey* claim at any time during that period, it could have been considered on the merits without the need for yet another stay of execution.[9]

McKenzie's claim also differs from Harris' in that McKenzie's claim did not accrue until substantial time had passed after imposition of the sentence, whereas Harris' claim—that execution by lethal gas is cruel and unusual punishment—had been available to him ever since he was sentenced. Nevertheless, McKenzie's *Lackey* claim did arise long before he first raised it two-and-a-half weeks ago. As McKenzie himself points out, he has been on death row now for two decades. At the time his case was last remanded to the district court in 1990, McKenzie had been on death row for 15 years, almost as long as Lackey himself. When we disposed of McKenzie's claim in June 1994, he had been on death row for 19 years. The *Lackey* claim could have been raised and considered at either of those times, or anytime in between, without having to vacate a death warrant.

McKenzie has offered no reason for failing to raise the claim earlier except his counsel's belief that the claim would not succeed. Yet that did not prevent a similar claim by Richmond in 1984, *see* 948 F.2d at 1491–92, or by Lackey himself. *Harris* again provides important guidance. Harris' claim that execution by lethal gas is cruel and unusual had

---

**7.** The state notes that McKenzie's lawyer throughout the federal habeas proceedings was Timothy K. Ford, who was also Richmond's lawyer at the time he raised the claim of inordinate delay. We draw no inference from this fact, other than that both McKenzie and Richmond have been exceptionally well represented. McKenzie should not be prejudiced by the fact that it was his lawyer who litigated this issue on behalf of another client. What we find dispositive is that the claim was available to a lawyer of reasonable competence litigating death penalty cases in this circuit.

**8.** We say "arguably" because so long as the claim was not finally addressed by the Supreme Court, a death row inmate would have been well

within his rights in raising the issue to preserve it for Supreme Court review.

**9.** McKenzie's second habeas petition was brought on the limited grounds that an ex parte meeting between the judge and prosecutor in his case rendered his sentence unconstitutional under the rule announced in *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). McKenzie nevertheless also challenged the application of the 1983 amendments to the death penalty statute as a bill of attainder. There is no reason McKenzie could not also have raised his *Lackey* claim and his various challenges to the ex post facto application of the 1981 and 1983 amendments to Montana's death penalty statute in this petition. He could also have brought his third federal habeas petition much earlier.

been considered and firmly rejected by the Fifth Circuit in 1983, prompting a dissent from the denial of certiorari from Justice Marshall. *See Gray v. Lucas,* 710 F.2d 1048 (5th Cir.), *cert. denied,* 463 U.S. 1237, 1240, 104 S.Ct. 211, 213, 77 L.Ed.2d 1453 (1983) (Marshall, J., dissenting from the denial of certiorari). And Harris' reason for bringing his claim late was in other respects much more compelling than McKenzie's: The then-recent execution by lethal gas of Donald Harding by the state of Arizona, and that state's change in the method of execution prompted by that experience, provided a new factual basis for the claim that death by gassing was cruel and unusual. *See Fierro v. Gomez,* 865 F.Supp. 1387, 1407–08 (N.D.Cal. 1994).[10]

■ While likelihood of success on the merits did not enter into the Supreme Court's equitable calculus in *Harris,* we nevertheless deem it prudent to give McKenzie's *Lackey* claim preliminary consideration because a very strong showing of likelihood of success on the merits might, in rare circumstances, outweigh abusive delay in raising the claim.[11] Our consideration of the merits starts with the opinion of our colleagues in the *Richmond* case which, though not binding, is nonetheless highly persuasive:

> A defendant must not be penalized for pursuing his constitutional rights, but he also should not be able to benefit from the ultimately unsuccessful pursuit of those rights. It would indeed be a mockery of justice if the delay incurred during the prosecution of claims that fail on the merits could itself accrue into a substantive claim to the very relief that had been sought and properly denied in the first place. If that were the law, death-row inmates would be able to avoid their sentences simply by delaying proceedings be-

yond some threshold amount of time, while other death-row inmates—less successful in their attempts to delay—would be forced to face their sentences. Such differential treatment would be far more "arbitrary and unfair" and "cruel and unusual" than the current system of fulfilling sentences when the last in the line of appeals fails on the merits. We thus decline to recognize Richmond's lengthy incarceration on death row during the pendency of his appeals as substantively and independently violative of the Constitution.

948 F.2d at 1491–92.

McKenzie cites various authorities to the contrary, perhaps the most powerful of which is the ruling of the Privy Council in *Pratt & Morgan v. Attorney General for Jamaica,* 3 SLR 995, 2 AC 1, 4 All ER 769 (Privy Council 1993) (en banc) (delay of 14 years before carrying out an execution violated section 17(1) of the Jamaican Constitution). *See also Catholic Comm'n for Justice and Peace in Zimbabwe v. Attorney General,* No. S.C. 73 (Zimb. June 24, 1993) (delays of two, three and five years coupled with unusually harsh conditions of incarceration); *Soering v. United Kingdom,* 11 Eur.Hum.Rgts.Rep. 439 (1989) (delay in execution of death sentences in the United States constitutes inhuman and degrading punishment such that extradition is not warranted); *Riley v. Attorney General of Jamaica,* 1 AC 719, 734, 3 All ER 469, 478 (Privy Council 1983) (Lord Scarman, dissenting). With all due respect to our colleagues abroad, we do not believe this view will prevail in the United States.

We are not confronted with a situation where the State of Montana has set up a scheme to prolong the period of incarceration, or rescheduled the execution repeatedly in order to torture McKenzie. The delay has been caused by the fact that McKenzie has

---

10. The dissent would have us hold that *Harris* does not apply because McKenzie had no "positive authority" for his claim until Justice Stevens published his memorandum in *Lackey. See* dissent at 1475. Given the state of the law concerning the constitutionality of execution by gassing prior to 1990, this hardly distinguishes *Harris.*

11. A different analysis altogether would apply if a petitioner were to make a strong showing of

actual innocence on the eve of his execution. McKenzie, of course, makes no claim of actual innocence. Nor does he claim trial error of any sort; this renders inapposite *Sawyer v. Whitley,* —— U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), which requires a showing "by clear and convincing evidence that but for the constitutional error, *no reasonable jury would find him eligible for the death penalty." Id.* at ——, 112 S.Ct. at 2523.

availed himself of procedures our law provides to ensure that executions are carried out only in appropriate circumstances. That this differs from the practice at common law, where executions could be carried out on the dawn following the pronouncement of sentence, *see Pratt & Morgan,* advance copy at 2, is a consequence of our evolving standards of decency, which prompt us to provide death row inmates with ample opportunities to contest their convictions and sentences. Indeed, most of these procedural safeguards have been imposed by the Supreme Court in recognition of the fact that the common law practice of imposing swift and certain executions could result in arbitrariness and error in carrying out the death penalty. *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). We cannot conclude that delays caused by satisfying the Eighth Amendment themselves violate it.[12]

We are also mindful that sustaining McKenzie's claim would dramatically alter the calculus in granting stays of execution in the hundreds of death penalty cases now pending before the state and federal courts. By and large, courts have erred on the side of caution in granting stays of execution sought by death row inmates. While the resulting delay may undermine the state's interest in carrying out its sentence expeditiously, *see In re Blodgett,* 502 U.S. 236, 112 S.Ct. 674, 116 L.Ed.2d 669 (1992), death row inmates have generally been successful in arguing that stays of execution should be freely granted because the state's interest in carrying out its sentence will not be permanently impaired. This argument would lose much of its force in a regime where the state risks being pushed permanently out of bounds if the execution is too long deferred

by the process of adjudication. By and large, the delay in carrying out death sentences has been of benefit to death row inmates, allowing them to extend their lives, obtain commutation or reversal of their sentences or, in rare cases, secure complete exoneration.[13] Sustaining a claim such as McKenzie's would, we fear, wreak havoc with the orderly administration of the death penalty in this country by placing a substantial premium on speed rather than accuracy.

Finally, it is unclear to us whether, even if it were held that delay in the imposition of the death penalty constitutes cruel and unusual punishment, commutation of the death penalty will turn out to be the appropriate remedy. Unlike the claim raised by Harris, for example, which dealt with cruelty in the method of a future execution, whatever anguish McKenzie has suffered is in the past and cannot be undone. Vacating the death sentence would punish the state and perhaps speed up the rate of future executions, but it would not relieve McKenzie and those in his position of the pain they have already suffered. When prisoners complain about the conditions in prison, we do not commute their sentence; we order the conditions ameliorated. If inordinate delay in carrying out an execution is adjudged to be a problem of constitutional dimension, there may be other remedies that are more appropriate in addressing the harm done.

■ Based on these considerations, we conclude that it is highly unlikely that McKenzie's *Lackey* claim would be successful if litigated to its conclusion. This factor therefore does not outweigh the strong presumption against granting a stay created by our determination that McKenzie's delay in raising the claim on the eve of his execution is abusive.[14] McKenzie nevertheless argues

---

**12.** In this we are reminded of the following quote from *Deutscher v. Whitley,* 991 F.2d 605 (9th Cir.1993):

> We recognize that one who is sentenced to death need not have *excessive* review before the penalty is carried out, but the constitutional mandate of *adequate* review requires strict adherence. To provide less renders the death penalty cruel and unusual.

*Id.* at 607 (citations omitted) (emphasis in original).

**13.** We note that of the 5000 or so people sentenced to death since *Furman,* some 1700 have obtained some form of relief from the death penalty. Bureau of Justice Statistics, Capital Punishment 1993, at 12.

**14.** In *Harris,* the district court entered a stay of execution based on its determination that petitioner had made a substantial showing that execution by gas would, indeed, constitute cruel and unusual punishment. *See Gomez v. United States*

that we have an obligation to enter a stay because the Supreme Court recently entered a stay in *Lackey* to allow the district court in that case to consider whether inordinate delay in carrying out the sentence of death constitutes cruel and unusual punishment. *Lackey v. Scott,* —— U.S. ——, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995). McKenzie argues that the Supreme Court's stay in *Lackey* is a signal that the inferior federal courts must enter stays of execution in all cases raising colorable *Lackey* claims.

We have carefully examined the Supreme Court's order in *Lackey* in light of the procedural history of that case, and we do not read it so broadly. To begin with, *Lackey* is a case where the district court exercised its discretion by entering a stay, which was then lifted by the Fifth Circuit.[15] By reinstating the stay in *Lackey,* the Supreme Court was arguably deferring to the discretion of the initial decision-maker in that case, which was the district court. More importantly, the question of manipulative delay so prominent in *Harris* was not at issue in *Lackey.* Lackey had raised his claim of inordinate delay in his first federal habeas petition, a fact carefully considered by the district court in determining whether to issue the stay. *Lackey v. Scott,* 885 F.Supp. 958, 965–66 (W.D.Tex.

1995). Finally, we read the Supreme Court's laconic stay in *Lackey* as an indication that the justices wish to see the matter explored in cases where it is properly raised, not as a ruling that stays must be entered in all cases raising *Lackey* claims in disregard of all other equitable considerations. *Harris,* again, provides useful guidance: Although the constitutionality of execution by lethal gas was being seriously considered by the district court, *see Fierro,* 865 F.Supp. at 1389–90, Harris' execution was allowed to go forward because equitable considerations weighed so heavily against any further delay in carrying out his sentence.[16] Without more explicit guidance, we cannot conclude that the Supreme Court intends to halt virtually all executions in this country for the many months, perhaps years, it will take for the issue to be fully explored and resolved.[17]

As the Supreme Court has directed, we "consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief" and weigh heavily "the State's strong interest in proceeding with its judgment." *Harris,* 503 U.S. at 654, 112 S.Ct. at 1653. McKenzie could and should have raised his *Lackey* claim at a time when it was capable of being resolved without staying a scheduled execution.[18] When

Dist.Ct. for the N.Dist. of Cal., No. 92–70237, 1992 WL 155238, at *1 (9th Cir.1992). In lifting the stay, the Supreme Court held that it was an abuse of discretion for the district court to have issued a stay in the face of Harris' abusive delay. We cannot conclude that it is improper for us to deny a stay in circumstances very similar to those where the Supreme Court held it was an abuse of discretion to enter one.

15. We note that the grounds on which the Fifth Circuit lifted the stay are of questionable merit. *See Lackey v. Scott,* 52 F.3d 98, 100 (5th Cir. 1995). The Fifth Circuit in *Lackey* held that the claim was *Teague* barred because it was a novel claim first raised by a petitioner on collateral review. *See Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). But a claim like McKenzie and Lackey's cannot normally be raised on direct appeal because much of the delay complained of arises in post-conviction proceedings.

16. The dissent argues it is unfair to let Lackey litigate his claim to fruition while executing McKenzie. This, it seems to us, is no more unfair than executing Harris while allowing Gomez and others similarly situated to litigate the

question of whether execution by lethal gas is unnecessarily cruel. Indeed, at least two other prisoners have been executed recently even though they raised potentially meritorious *Lackey* claims on the eve of their executions. *See Free v. Peters,* 50 F.3d 1362 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1397, 131 L.Ed.2d 247 (1995); *Williams v. Chrans,* 50 F.3d 1363 (7th Cir.1995).

17. We say "virtually all executions" based on our experience that inmates on death row facing imminent execution normally have spent many years awaiting their fate.

18. The dissent argues that *Harris* was an extraordinary case, one where the abuse was so patently obvious that reasonable minds could not disagree that Harris was trying to manipulate the system. In fact, *Harris* was not all that different from a lot of cases we see; reasonable minds in fact *did* disagree as to whether Harris' motion for a stay was abusive. *See* Stephen Reinhardt, *The Supreme Court, the Death Penalty, and the Harris Case,* 102 Yale L.J. 205, 207 (1993) (noting that the district judge who entered the first stay in *Harris* "behaved in a conscientious and orderly

considered in light of what we see as a low probability of ultimate success on the merits of McKenzie's *Lackey* claim, we find no basis for exercising our equitable discretion in issuing a stay.

Nor are we able to issue a stay based on any of McKenzie's other claims. Each of those claims also could and should have been raised at a much earlier time. In any event, each is either patently without merit or fails to state a federal claim under 28 U.S.C. § 2254(a). McKenzie's claim that the state violated his rights under the ex post facto clause by changing the place and procedures applicable to his execution is precluded by *Holden v. Minnesota*, 137 U.S. 483, 491, 11 S.Ct. 143, 146, 34 L.Ed. 734 (1890), which stands for the proposition that such matters are "regulations that do not affect [the prisoner's] substantial rights." McKenzie's claim that he was denied due process of law because the state did not disclose the identity of the executioner and gave him insufficient time and information to make a reasoned selection of the method of execution is similarly without merit. The state has broad discretion to determine the procedures for conducting an execution; we are aware of no authority for the proposition that a prisoner is entitled, for example, to have a lethal injection administered by a physician. Montana's procedures are reasonably calculated to ensure a swift, painless death and are therefore immune from constitutional attack. *See Campbell v. Wood*, 18 F.3d 662, 687 (9th Cir.1994) ("The risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review.").

The only other of McKenzie's claims that deserves more than cursory discussion is that the state improperly changed its death penalty law to remove the authority of the court scheduling an execution to also reconsider the sentence. A removal of discretion to mitigate a sentence can, under the law of this circuit, violate the ex post facto clause. *See United States v. Paskow*, 11 F.3d 873, 877 (9th Cir.1993). McKenzie has, however, pointed to no authority in Montana law supporting his claim that trial courts there ever had that authority. Indeed, McKenzie's execution was rescheduled a number of times before Montana amended its death penalty statute and there is no evidence that he could have sought mitigation of his sentence at any of these proceedings. McKenzie's claim that the state courts had authority to reconsider a death sentence when rescheduling an execution rests entirely on his interpretation of former section 95–2303 of the Montana Code, which reads as follows:

> In pronouncing the sentence of death, the court shall set the date of execution which must not be less than 30 days nor more than 60 days from the date the sentenced is pronounced.

Rev.Code Mont. § 95–2303 (1947), *amended and recodified at* Mont.Code Ann. § 46–19–103.

As we read this section, however, it imposes an obligation to set a date of execution at the time the sentence is pronounced, not vice versa. McKenzie offers no opinion of the Montana courts, or any other authority for that matter, in support of his counterintuitive interpretation.[19] Absent guidance from the

---

manner that all other judges ... would do well to emulate"); John T. Noonan, *Should State Executions Run on Schedule?*, New York Times, Apr. 27, 1992, at A15 (suggesting that lifting the stay in *Harris* amounted to "treason to the Constitution"). Indeed, ten judges of this court were sufficiently convinced that Harris' claim was not frivolous they issued a stay only hours before the scheduled execution. Reinhardt, *The Supreme Court, supra*, at 210–11. Even after the Supreme Court issued its *Harris* decision one of our colleagues thought it appropriate to enter a further stay. *See* Charles Fried, *Impudence*, 1992 Sup. Ct.Rev. 155, 189. The simple fact is that Harris' case was no more extraordinary than McKenzie's.

**19.** The only authority we have that is directly on point is the Montana Supreme Court's most recent opinion in this case. After first noting that the trial court did not "resentence" McKenzie under the new statute, the Montana Supreme Court further remarked that "McKenzie was 'sentenced' and the death penalty was 'imposed' on March 3, 1975; that sentence has never been vacated by any court." *Montana v. McKenzie*, 894 P.2d at 292. Notably, the Montana Supreme Court does *not* state that McKenzie was "resentenced" on any of the seven occasions on which his execution was rescheduled between 1975 and 1982.

state courts suggesting that section 2303 ought not be read according to its plain meaning, we conclude that it did not confer upon the state trial court any authority to reconsider the death sentence once it had been pronounced. *Cf. State v. Hanners*, 254 Mont. 524, 839 P.2d 1267, 1268 (1992) (trial courts do not have the authority to reconsider a sentence once it has been pronounced absent specific statutory authorization).[20] The 1981 amendment and recodification of section 2303 pursuant to which McKenzie's execution was rescheduled thus did not remove the discretion of the sentencing authority and does not violate the ex post facto clause.

## B. The Merits

McKenzie argues, in the alternative, that we should bypass the equitable considerations applicable to issuance of a stay and simply issue the writ based on his *Lackey* claim. According to McKenzie, the inordinate delay in carrying out the sentence of death, regardless of any other factor, conclusively establishes that he has suffered cruel and unusual punishment. As we noted above, however, we are skeptical of the merits of the *Lackey* claim, *see* pp. 1465–68, *supra*, not to mention his other claims, see pp. 1469–70, *supra*. We are all the more reluctant, therefore, to grant the equivalent of summary judgment on McKenzie's claim.[21] In essence, McKenzie asks us to grant on the

merits the very claim that the Supreme Court ordered to be examined in *Lackey*, a claim which, as Justice Stevens explained in his memorandum, is highly fact-intensive. We decline to do so.

## Conclusion

McKenzie's motion for a stay of execution of the sentence of death and his alternative motion for summary issuance of the writ on his *Lackey* claim are denied.

WILLIAM A. NORRIS, Circuit Judge, dissenting:

The majority begins its opinion by misrepresenting what is before us. Two matters were presented by McKenzie: 1) an appeal from the district court's dismissal of the petition for habeas corpus and 2) a motion for a stay of execution made directly to this court. The resolution of the first issue is clear—the district court erred in its sua sponte dismissal McKenzie's petition as "successive and repetitive" without giving him a chance to respond. Given this clear error, we should have immediately vacated the dismissal and quickly remanded to the district court for proper proceedings, permitting the district court to exercise its discretion and rule on McKenzie's application for a stay in light of the Supreme Court's issuance of a stay in a nearly identical case, *Lackey v. Scott*, —— U.S. ——, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995).[1] Instead, we held on to this case in

---

**20.** In reaching this conclusion, we are aware of the distinction between the pronouncement of a judgment which includes a sentence of death and the issuance of a death warrant. The latter is merely a ministerial, nondiscretionary act carried out in furtherance of the former. *Montana v. McKenzie*, 894 P.2d at 291; *Nebraska v. Joubert*, 246 Neb. 287, 518 N.W.2d 887, 891 (1994). The setting of an execution date through the issuance of a death warrant is within the inherent power of the court to enforce its own judgments, *Joubert*, 518 N.W.2d at 894, and we are aware of no capital punishment scheme where the court is required to resentence the defendant in order to reschedule the execution.

**21.** In commenting on the merits of McKenzie's claim, we do not minimize in any way the anguish that is suffered by death row inmates who repeatedly face the near-certain probability of death. A number of death row inmates have refused to avail themselves of avenues of review

precisely to avoid this ordeal. *See, e.g., Demosthenes v. Baal*, 495 U.S. 731, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990) (per curiam); *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976); *Washington v. Dodd*, 120 Wash.2d 1, 838 P.2d 86 (1992). This option is available to anyone sentenced to die, and to the extent petitioners choose to delay execution in the hope of obtaining relief, that is a choice they make for themselves.

**1.** Briefly, Lackey raised an Eighth Amendment claim challenging the constitutionality of executing a prisoner after seventeen years on death row in state habeas proceedings. On March 3, 1995, the Supreme Court stayed his execution pending its decision on certiorari. *Lackey v. Texas*, —— U.S. ——, 115 S.Ct. 1274, 131 L.Ed.2d 192 (1995). On March 27, 1995, the Court denied certiorari, but Justice Stevens issued a memorandum arguing that this novel claim had foundation in prior precedent and that it deserved fur-

order to issue an opinion that inexplicably fails to rule on the appeal of the district court's order of dismissal. Without disposing of the appeal, the majority denies the motion for stay made to this court only by seriously misconstruing the Supreme Court's holding in *Gomez v. United States Dist.Ct. for the Dist. of Cal.,* 503 U.S. 653, 112 S.Ct. 1652, 118 L.Ed.2d 293 (1992) (hereinafter *"Harris"*), and committing the same due process violations committed by the district court below. The result of this bizarre combination of rulings and failures to rule is that the dismissal of the petition has neither been affirmed, nor vacated, but remains before this court, waiting to be mooted by the un-stayed execution of the petitioner. I begin my dissent from this unprecedented disposition with a brief but necessary review of the history of this case.

In January of 1975, McKenzie was convicted of deliberate homicide and aggravated kidnapping. Intent was a major issue at trial because the defense argued that McKenzie was incapable of harboring the mental states required for conviction of these crimes due to mental disease or defect.

On March 3, 1975, McKenzie was sentenced to death. The sentencing judge gave two reasons for imposing the death penalty: (1) that McKenzie posed a danger to society and (2) that Montana law did not provide for life imprisonment without possibility of parole, so that absent a sentence of death, McKenzie "would only be required to serve approximately seven years ... before he would be turned loose to menace society again." Sentencing Order at 8–9.

Nearly twenty-one years later, McKenzie is still on death row. The extraordinary delay in carrying out his death sentence is not of McKenzie's making. It is primarily the result of two actions taken by the trial judge—one of which was not discovered until

almost ten years after the judge sentenced McKenzie to death—that raised serious questions about whether the State of Montana convicted and sentenced McKenzie in violation of the United States Constitution. First, the judge gave instructions to the jury that violated due process by shifting to McKenzie the burden of proving lack of intent. Second, the judge had an *ex parte* meeting with the prosecutor about the case shortly before sentencing that the prosecutor admitted "may have included" a discussion about the brutality of the murder, evidence that the victim was raped, and McKenzie's psychiatric defenses. *McKenzie v. McCormick,* 27 F.3d 1415, 1418 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 916, 130 L.Ed.2d 797 (1995). *See* Appendix & part VI n. 13, *infra.*

On March 27, 1995, McKenzie appeared at a hearing on a motion by the State of Montana to set a new date for his execution through the issuance of a death warrant. At that hearing, McKenzie requested resentencing pursuant to the death penalty statutes in effect at the time his crime was committed, which, he argued, permitted the court to reconsider the appropriateness of a sentence of death in 1995. He then argued that he should be resentenced to life imprisonment because the reasons why he was originally sentenced to death were no longer valid: Montana law had been amended to provide for a life sentence without the possibility of parole and his exemplary behavior during his 20 years of imprisonment proved that he was no longer a danger to society.

The court refused to apply or interpret the 1975 sentencing statute and, instead, applied the law as it was amended in 1981. The court plainly had no discretion to resentence McKenzie under the 1981 version of the statute. The court's authority was explicitly lim-

ther consideration by the lower courts. *Lackey v. Texas,* —— U.S. ——, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (Stevens, J. respecting denial of certiorari). Justice Breyer agreed that the issue is "important and undecided." *Id.* Lackey immediately filed his second habeas petition in federal court, raising the same claim. The district court granted a stay of execution to permit time to fully consider the claim. Order, *Lackey v. Scott,* No. MO–95–CA–68–F, 885 F.Supp. 958 (W.D.Tex.

April 21, 1995). The Fifth Circuit vacated the stay, stating that Lackey's claim was barred by *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). *Lackey v. Scott,* 52 F.3d 98 (5th Cir.1995). A day later, the Supreme Court summarily issued its own stay of execution, without dissent, "pending the district court's consideration of the petitioner's petition for habeas corpus." *Lackey v. Scott,* —— U.S. ——, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995).

ited to setting a new execution date, which was, as the court stated, merely a "procedural and ministerial act." *Montana v. McKenzie,* —— Mont. ——, 894 P.2d 289, 291 (1995). Accordingly, the court issued a death warrant and scheduled McKenzie's execution for May 10, 1995.

On April 11, 1995, the Montana Supreme Court, agreeing with the state trial judge, dismissed McKenzie's appeal on the ground that the order rescheduling the execution, as a ministerial act, was not an appealable order. Accordingly, the Montana Supreme Court refrained from ruling on any of McKenzie's substantive claims.

On April 18, 1995, McKenzie submitted his third federal habeas petition in the United States District Court for the District of Montana. He moved for an order directing the state to file an Answer, which the State opposed. The State also requested permission to file a motion to dismiss raising "many procedural bars." However, rather than grant the State permission to file its motion to dismiss, the district court dismissed the petition sua sponte in a one-sentence order: "this third federal habeas corpus petition is meritless as a successive and repetitive petition."

On April 21, 1995, McKenzie filed a notice of appeal to the Ninth Circuit and on April 28, 1995 he filed a motion to stay his execution.

## I

### District Court's Sua Sponte Dismissal

In sua sponte dismissing the third habeas petition as "successive and repetitive" within forty-eight hours after receiving it, the district court made two flagrant errors. First, it wrongly decided that all of McKenzie's claims were "successive." A claim is "successive" if it was raised in an earlier petition, or if it fails to raise a ground for relief that is new or different than a claim raised in an earlier petition and determined on the merits. *Campbell v. Blodgett,* 997 F.2d 512, 515–16 (9th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 1337, 127 L.Ed.2d 685 (1994). The

State concedes that McKenzie has never previously raised most of the claims in his petition, including his Eighth Amendment and Ex Post Facto claims, *see* parts V & VI *infra.*

It is the abuse of the writ doctrine that applies to claims raised for the first time in a second or subsequent petition. *McCleskey v. Zant,* 499 U.S. 467, 470, 111 S.Ct. 1454, 1457, 113 L.Ed.2d 517 (1991). Here, even if the district court's order is construed as dismissing the non-successive claims as an abuse of the writ, the district court failed to follow the proper procedure for raising and deciding abuse of the writ, as prescribed by the Supreme Court in *McCleskey:*

> When a prisoner files a second or subsequent application, the government bears the burden of pleading abuse of the writ. The government satisfies this burden if, with clarity and particularity, it notes petitioner's prior writ history, identifies the claims that appear for the first time, and alleges that petitioner has abused the writ. . . . To excuse his failure to raise the claim earlier, petitioner must show cause for failing to raise it and prejudice therefrom as those concepts have been defined in our procedural default decisions. . . . If petitioner cannot show cause, the failure to raise the claim in an earlier petition may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim.

*Id.* at 494–95, 111 S.Ct. at 1470.[2]

The district court failed to observe these required procedures, dismissing McKenzie's petition without requiring the State to raise its affirmative defenses and without providing him notice or an opportunity to demonstrate cause and prejudice or miscarriage of justice. A petitioner need not anticipate an abuse of the writ defense and plead cause and prejudice or miscarriage of justice in advance. *Price v. Johnston,* 334 U.S. 266, 291–92, 68 S.Ct. 1049, 1062–63, 92 L.Ed. 1356 (1948). As a necessary corollary, the district court may not rule on an assertion of abuse

---

**2.** The same standard applies for allegations of successive petitions. *Sawyer v. Whitley,* —— U.S. —— , ——–––——, 112 S.Ct. 2514, 2518–19, 120 L.Ed.2d 269 (1992).

of the writ without giving the petitioner an opportunity to show cause and prejudice or miscarriage of justice. *See Lugo v. Keane,* 15 F.3d 29, 31 (2d Cir.1994); *Williams v. Whitley,* 994 F.2d 226, 232 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 608, 126 L.Ed.2d 572 (1993); *United States v. Fallon,* 992 F.2d 212, 213 (8th Cir.1993); *Johnson v. Copinger,* 420 F.2d 395, 399 (4th Cir.1969).

On appeal, the State defends the sua sponte dismissal by arguing that "[s]ummary disposition by the district court was appropriate in this case, due to the obvious lack of merit of Petitioner's claims, the fact that this is McKenzie's third habeas petition and the short period of time available until his execution date due to the last minute filing of his third petition." Appellee's Brief at 8. None of these reasons relieve the district court of its obligations under *McCleskey.* First, although the State asserts that the court dismissed the petition as meritless, it is clear that the district court never considered the merits of the claims, but dismissed on purely procedural grounds. *See* Order, No. CV–95–44–GF, April 20, 1995, at 1 ("this third federal habeas corpus petition is meritless as a successive and repetitive petition"). Second, that this is a third petition is no reason to ignore the procedural mandates of *McCleskey,* which was explicitly intended to govern district court procedure "[w]hen a prisoner files a second or subsequent application" for habeas relief. 499 U.S. at 494, 111 S.Ct. at 1470. Third, while the district court has authority to expedite consideration of a habeas petition filed close to an execution date, it does not have discretion simply to ignore McKenzie's due process right to notice and the opportunity to be heard, under procedures clearly mandated by the Supreme Court. *See In re Blodgett,* 502 U.S. 236, 240, 112 S.Ct. 674, 676, 116 L.Ed.2d 669 (1992).

As the Court in *Price v. Johnston* stated:

We are not unaware of the many problems caused by the numerous and successive *habeas corpus* petitions filed by prisoners. But the answer is not to be found in repeated denials of petitions ... without the prisoners having an opportunity to defend against their alleged abuse of the writ.

334 U.S. at 293, 68 S.Ct. at 1064 (footnote omitted).

**II**

**Abuse of the Writ**

Thus, although the majority does not address the issue, the district court clearly erred in failing to follow the procedure mandated by *McCleskey* for addressing abuse of the writ allegations. The State, nonetheless, argues that even if the district court erred procedurally, this court should reach and decide the abuse of the writ question in the first instance. For the reasons explained below, it would be improper for this court to engage in such fact-finding in the first instance. Because these reasons are also applicable to the majority's sua sponte application of *Harris* to this case, I discuss them in some detail.

Even though it still has not pled abuse of the writ in the manner required by *McCleskey,* and even though the petitioner still has not been given the opportunity to fully demonstrate cause or miscarriage of justice, the State asks this court to make an independent determination that McKenzie's petition is successive and abusive. The State argues that this court could properly hold that McKenzie's petition is abusive because the petitioner "has failed to assert, let alone demonstrate, the requisite 'cause' for failing to raise his claim of unconstitutional delay earlier." Appellee's Brief at 22. Thus, the State seems to argue either that the petitioner bore the burden of demonstrating cause or miscarriage of justice in his initial petition or that we can undertake an independent evaluation of these mixed questions of law and fact through an examination of the briefs filed on appeal. These suggestions find support in neither law nor logic. Both are, in fact, precluded by the Supreme Court's decision in *Price,* 334 U.S. at 266, 68 S.Ct. at 1049.

In *Price,* the Supreme Court held that whether the petitioner had cause for not bringing his claim in a prior petition "is a matter which should be determined in the first instance by the District Court. And it is one on which the petitioner is entitled to be heard either at a hearing or through an amendment or elaboration of his pleadings.

Appellate courts cannot make factual determinations which may be decisive of vital rights where the crucial facts have not been developed." 334 U.S. at 291, 68 S.Ct. at 1063. The Court also repudiated the position now advocated by the State that the petitioner bore the burden of pleading cause in his initial petition. Instead, the Court held that "it rests with the Government to make that claim with clarity and particularity in its return to the order to show cause." *Id.* at 292, 68 S.Ct. at 1063. And, as the Court in *McCleskey* later reaffirmed, once the Government pleads abuse of the writ, the petitioner must be given a chance to respond. *Id.* at 292–93, 68 S.Ct. at 1063–64.

Finally, the Court held that the course of the proceedings in the district court—which are essentially identical to the course of proceedings in this case—were patently inadequate:

> It is obvious that the procedure followed in the District Court in the instant proceeding precluded a proper development of the issue of the allegedly abusive use of the *habeas corpus* writ. The Government's response to the order to show cause was too indefinite and vague to give petitioner a fair opportunity to meet this important issue. Merely quoting from the court's opinion in the third *habeas corpus* proceeding was not enough to require the petitioner to explain his reasons for failing to present earlier his allegation.... And the court either failed or was unable to delineate the issue by making specific findings and conclusions of law or by explaining its view of the matter in a written opinion.... [W]e reverse the judgment below and remand the instant case to the District Court for further proceedings consistent with this opinion.

*Id.* at 293, 68 S.Ct. at 1063–64.

The wisdom of the Court's decision in *Price* is made particularly clear in the circumstances of this case. Until it filed its Response Brief in this court, the State had not identified which claims it alleged to be

abusive or successive or when each claim should have been or was previously raised. Because of the expedited nature of this appeal, the petitioner then had only two days to respond,[3] the time we allotted for filing a Reply Brief.

Therefore, the lack of any record or any adequate opportunity for demonstrating cause and prejudice bars this court from addressing the abuse of the writ question for the first time on appeal.

## III

### The Majority's Sua Sponte Injection of Harris

Thus, it is for good reason that the majority does not affirm the district court's dismissal of the writ. The district court clearly erred in finding that the petition was "successive and repetitive," and we should have immediately reversed its dismissal without hearing argument, denied the motion for a stay addressed to this court, and expeditiously remanded the case to the district court. At that point, the district court would still have had time to call a scheduling conference to arrange an expedited hearing on the petitioner's motion for a stay, permitting the State to raise abuse of the writ and allowing the petitioner to demonstrate cause and prejudice or miscarriage of justice in the manner mandated by *McCleskey*. The court could also have considered whether to issue a stay as the district court in *Lackey* did, following the statements of Justice Stevens and Justice Breyer regarding the Eighth Amendment claim, *Lackey v. Texas*, —— U.S. ——, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (respecting denial of certiorari) and as the Supreme Court did after the district court's stay was vacated by the Fifth Circuit. *Lackey v. Scott*, —— U.S. ——, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995).

Rather than following this sensible procedure, the majority has decided to take no action on the appeal of the dismissal while denying the stay of execution on grounds

---

**3.** Because the State never made such an identification below, much less raised its affirmative defenses in a proper pleading, the petitioner's Opening Brief understandably did not undertake

a detailed showing of cause and prejudice or miscarriage of justice for each of his eight claims.

raised for the first time by the court at oral argument. In so doing, it effectively concedes that the district court's denial requires reversal and that McKenzie's third petition does not constitute an abuse of the writ. Nonetheless, the majority has paradoxically decided that because McKenzie did not bring his claim earlier, his potentially meritorious petition will be mooted by his potentially unconstitutional execution.

The rationale for this bizarre disposition of the case was first suggested at oral argument, when Judge Kozinski raised sua sponte the question whether the Supreme Court's decision in *Harris* might require us to deny the motion for a stay, even if we reversed the district court's summary dismissal of the petition and even if the unresolved claims were found to provide substantial grounds upon which relief might be granted. He then placed the burden on McKenzie's counsel to demonstrate, on the spot, that this factual assertion was untrue.

This sudden and unexpected demand to make an evidentiary showing at oral argument understandably caught McKenzie's counsel off guard. The State had never raised a *Harris* argument, either in district court or to this court in its briefs. Further, the State had never even intimated that the circumstances of this petition approached the extraordinary abuse of the judicial system addressed in *Harris*. Thus, the petitioner was forced to respond to Judge Kozinski's novel—and seemingly inapplicable—theory without any opportunity to research, brief, or even consider the issue.

However, McKenzie's counsel recovered sufficiently to provide a reasonable explanation for his actions. He explained as follows. The unconstitutional delay claim lacked any supporting authority before March 27, 1995 when Justice Stevens issued his memorandum in *Lackey*. Prior to that time, there was no positive authority to support the viability of such a claim, and in 1990 *Richmond v. Lewis* established as the law of this circuit

that such a claim was not cognizable under any circumstances. *Richmond v. Lewis*, 948 F.2d 1473, 1491–92 (9th Cir.1990), *rev'd on other grounds*, —— U.S. ——, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992), *vacated* 986 F.2d 1583 (1993).[4] On March 3, 1995, the Supreme Court stayed Lackey's execution pending its decision whether to grant certiorari on his unconstitutional delay claim. —— U.S. ——, 115 S.Ct. 1274. Twenty days later, in his very next filing before the Montana court, McKenzie's counsel raised the delay claim. On March 27, 1995, Justice Stevens' memorandum was published, providing the first positive authority for such a claim. On that same day, the state court refused to consider this and other claims at the hearing to reset McKenzie's execution date, as did the Montana Supreme Court on appeal. McKenzie's counsel stated that he filed McKenzie's third federal habeas petition in district court as soon as the Montana Supreme Court issued its order—without even waiting for a written opinion by the Montana Supreme Court.

Although oral argument did not afford him a real opportunity to present evidence, counsel represented to us that he had not deliberately withheld this claim in the hope of obtaining a last-minute stay of McKenzie's execution. Counsel described watching another client—William Andrews—approach his execution date, and actually be executed after 17 years and 11 months on death row, without raising this claim on his behalf precisely because he had learned from this court in *Richmond* that there was no basis for such a claim and because there was no authority to the contrary. He explained that he refused to raise frivolous claims, not only because such conduct is sanctionable, but also because he considers respect for the court to be paramount.

Finally, in response to Judge Kozinski's specific suggestion that McKenzie's Ex Post Facto claim should have been brought in the 1985 habeas petition, counsel explained that the statute at the core of this claim was

---

**4.** Even though our *Richmond* opinion was vacated in 1993 after the reversal and remand from the Supreme Court in 1992, the order vacating the opinion went unnoticed by counsel for both McKenzie and the State. Both mistakenly cited

it as controlling circuit precedent in their briefs. That the case had been vacated did not come to their attention until it was pointed out to them at oral argument.

applied to McKenzie for the first time on March 27, 1995. He further explained that he could not reasonably have anticipated that the State would try to apply new laws taking away privileges and rights to McKenzie retroactively, especially in light of Supreme Court authority that such laws implicate the protections of the Ex Post Facto Clause. In short, counsel explained that he had raised this claim within days after it arose.

The majority was not convinced. Instead, it makes an appellate finding of fact that McKenzie "raises claims that could have been brought much earlier, quite possibly as early as his first and second federal habeas petitions." Order at 1464–65 (footnote omitted). It then holds that this finding is sufficient, under *Harris,* to deny the petitioner a stay. Order at 1468–69. In so doing, the majority seriously misconstrues the law of *Harris* and wrongly concludes that the facts of this case are comparable to those in *Harris.*

### A

The introduction of *Harris* into this case at oral argument is surprising given the extreme and extraordinary circumstances of *Harris* and the lack of any contention by the State that similar circumstances were presented here.

The Court's decision in *Harris* was very brief and cryptic, owing undoubtedly to the hurried circumstances under which it was issued and the Court's obvious exasperation with the use of a section 1983 action to stay Harris' execution. The Court's suggestion that "[a] court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief" was not elaborated in the Court's brief opinion, nor has it been developed in subsequent cases. *Harris,* 503 U.S. at 654, 112 S.Ct. at 1653. Thus, the Court has not given any indication how *Harris* affects the Court's prior caselaw relating to habeas petitions and stays. Nor has the Court elaborated under what circumstances the timing of a stay application could outweigh the historical equitable interest in hearing an otherwise proper habeas petition.

However, read in context with the Supreme Court's other cases, *Harris* provides a rule of narrow application. Under ordinary circumstances, there is a strong equitable presumption in favor of granting stays of execution to permit full consideration of habeas petitions so long as the petition provides substantial grounds for relief. *See Barefoot v. Estelle,* 463 U.S. 880, 892–93, 103 S.Ct. 3383, 3394–95, 77 L.Ed.2d 1090 (1983). However, when a claim is withheld from a prior petition, without cause, that presumption is tempered. In order to obtain a stay to permit consideration on the merits, the petition must contain grounds for finding that the petitioner is either actually innocent or innocent of the death penalty. *See Delo v. Stokes,* 495 U.S. 320, 321, 110 S.Ct. 1880, 1881, 109 L.Ed.2d 325 (1990) (stay for second or successive petition may only be granted if it contains substantial grounds and is not barred by the abuse of the writ doctrine); *McCleskey,* 499 U.S. at 494–95, 111 S.Ct. at 1470–71 (failure to show cause may only be excused by showing miscarriage of justice); *Sawyer v. Whitley,* ——.U.S. at ——–——, 112 S.Ct. at 2518–21 (miscarriage of justice encompasses claims of actual innocence or innocence of the death penalty). In *Harris,* the Court extended this principle one step further: when the petitioner goes beyond simply abusing the writ and resorts to "last-minute attempts to manipulate the judicial process," a court may refuse to enter a stay, even when the petition would otherwise warrant consideration. *Harris,* 503 U.S. at 654, 112 S.Ct. at 1653.

Thus, *Harris* is best understood as an extension of the idea of abuse of the writ. Whenever a second or successive habeas petition is filed, and an abuse of the writ allegation is made by the State, the petitioner must show cause why he did not bring the claim in a *prior petition.* When that second or successive habeas petition is filed at the last minute, and an allegation of abusive manipulation of the judicial system is made, the petitioner must show that his failure to bring his *current petition* before the last minute is not the result of his intentional abuse or manipulation of the judicial system. *Harris,* 503 U.S. at 654, 112 S.Ct. at 1653; *Herrera v. Collins,* —— U.S. ——, ——, 113 S.Ct. 853,

874, 122 L.Ed.2d 203 (1993) (O'Connor, J., concurring). Thus, even if the petitioner could show cause and prejudice (or miscarriage of justice), for failing to raise his current claims in his prior petition, he still might be deprived of a stay if the court determines that his failure to bring his new petition before the last minute was part of a blatant attempt to manipulate the judicial system.

The extremely punitive sanction of *Harris*—refusal to consider claims that are otherwise proper and might save the life of the petitioner—has never before been considered appropriate except when the petitioner has completely failed to present even "a semblance of a reasonable excuse for the inordinate delay." *See Herrera,* — U.S. at —, 113 S.Ct. at 874 (O'Connor, J., concurring); *Harris,* 503 U.S. at 654, 112 S.Ct. at 1653.

Once the proper scope of *Harris* is understood, it is easy to see why the case in inapplicable here. First, McKenzie's petition is not a last-minute effort to stay an execution. Whereas Harris' stay petition was filed three days before his execution, McKenzie began exhausting his current claims more than six weeks ago. Second, this case does not involve an effort to stay an execution with an end run around habeas requirements by filing a § 1983 action. Nor is there any other allegation of manipulation of the judicial process or other forms of bad faith. Finally, although Harris' claim was clearly precluded by the abuse of the writ doctrine, McKenzie, unlike Harris, raises a miscarriage of justice claim that would excuse his late filing even if he could not show cause.

The majority is able to claim that this case is indistinguishable from *Harris* only by ignoring most of the central facts of this case. That is, the majority attempts to apply the extraordinary result in *Harris* to the very ordinary circumstances of this case by arguing that at its core, *Harris* was an unexceptional case.

Although the majority seems to think *Harris* was a run-of-the-mill habeas case, announcing a general rule for all habeas petitions, the truth is that *Harris* was an extraordinary case of limited application. Three days before Harris' scheduled execution, a class action was filed under § 1983

challenging the constitutionality of California's method of execution and requesting a temporary restraining order preventing further executions. The district court granted the temporary restraining order which had the sole effect of staying the execution of Harris, the only prisoner scheduled for execution in California in the 10 days following the order. In its brief order vacating the stay, the Supreme Court began by noting that the case constituted an "obvious attempt to avoid the application of" the abuse of the writ habeas corpus jurisprudence by seeking a stay of Harris' execution through a § 1983 suit, rather than through habeas. *Id.* The Court then noted that Harris had filed several previous habeas petitions, none of which raised this claim, a claim that could have been brought in one of his prior petitions. After noting that this newest stay was obviously prohibited under the abuse of the writ doctrine, the Court noted that in any event, an application for a stay is a request for equitable relief. The Court concluded that even if the claims advanced in the class action had not been barred as abusive, the Court would have denied Harris equitable relief because of his "last-minute attempts to manipulate the judicial process." *Id.*

The majority reads the outcome in *Harris* as turning on the simple fact of inexcusable delay, rather on the extraordinary fact of bad faith manipulation of the system. To do so ignores both the plain language of the decision and the central facts of the case. The Court did not say that equity prohibited a stay simply because the claim was made too close to the execution date. Instead, it's weighing of the equities concentrated on the perceived "*manipulation* of the judicial process." The word "manipulation" is important. It requires intent—the Court believed that Harris had, *in bad faith,* "attempt[ed] to avoid the application of *McCleskey*" and the abuse of the writ doctrine by pursuing a § 1983 action instead of yet another habeas petition. The language of manipulation is not accidental, but rather points to the central facts upon which the case turned.

Furthermore, to read the case as the majority does would effect a remarkable transformation of habeas jurisprudence, even

though there is no indication that the Supreme Court believed itself to be engaged in such an undertaking. But there is no authority for reading *Harris* as partially completely overhauling the Court's prior stay jurisprudence sub silentio. The Supreme Court has surely not read *Harris* as such a radical departure from its prior cases. In the three years since its announcement, *Harris* has only been cited by members of the Court in a single, concurring opinion joined by one other Justice. *Herrera v. Collins,* — U.S. —, —, 113 S.Ct. 853, 874, 122 L.Ed.2d 203 (1993) (O'Connor, J., concurring). To my knowledge, no other circuit read *Harris* as significantly changing prior habeas caselaw.

### B

The application of the majority's radically expansive reading of *Harris* in this case is particularly troublesome here: First, the majority's extremely low standard for finding manipulation of the judicial process under *Harris* permits it to effectively dismiss McKenzie's petition under an abuse of the writ standard, even though a review of cause and prejudice is inappropriate in the posture of this case. Second, the majority's misreading of *Harris* permits the Court to apply an abuse of the writ standard, but without regard to McKenzie's strong argument that he is innocent of the death penalty, even though there is no evidence that he has engaged in the outrageous manipulation of the system the Court believed had occurred in *Harris*.

### 1

Because the *Harris* theory of manipulation of the system was raised sua sponte by this court for the first time at oral argument, petitioner has never had a fair chance to respond to it. In depriving him of this opportunity, the majority commits the same error as did the district court when it sua sponte dismissed the petition as an abuse of the writ. If it was error for the district court to deny the petitioner a chance to respond to the claim of abuse of the writ—and it surely was—it is also error for this court to raise the much more serious claim of manipulation of the system sua sponte and deprive the

petitioner of the same opportunity to gather evidence and make a contrary showing.

If the majority is announcing a new rule under *Harris*—that any petitioner seeking a stay of execution within some unspecified period of time prior to his execution must affirmatively demonstrate cause for failing to bring his petition sooner than he did even if the State does not raise the issue—McKenzie can hardly be faulted for failing to anticipate it. This is particularly true since such a requirement is the exact opposite of the requirements under the related abuse of the writ doctrine. *See Price,* 334 U.S. at 291–92, 68 S.Ct. at 1063; *McCleskey,* 499 U.S. at 494–96, 111 S.Ct. at 1470–71. I cannot understand how the heightened due process concerns that accompany the State's taking of a life can be satisfied by the retroactive application of a new procedural rule, first raised by the court sua sponte on appeal.

### 2

Even if we set aside the unfairness of requiring McKenzie to demonstrate compliance with the majority's new interpretation of *Harris* under these conditions, the majority's application of this new rule deprives him of his miscarriage of justice argument, even though he has done nothing like the abusive manipulation of process found in *Harris*.

Absent the wrongful application of *Harris*, McKenzie could have avoided claims of abuse of the writ by showing that his claim, if proven, would render him "innocent of the death penalty." *See Sawyer,* — U.S. at — – —, 112 S.Ct. at 2519–20. In *Sawyer,* the Court held that an abusive or successive petition must be heard on the merits if the petition presents a claim that "but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Id.* at —, 112 S.Ct. at 2525. In other words, in order to make a claim of actual innocence of the death penalty, the petitioner must show that but for the violation of the Constitution, he would not be eligible for the death penalty.

In this case, the petitioner argues that the extended delay between sentencing and exe-

cution of the death sentence, along with the conditions in which he has been confined on death row, have made him ineligible for execution pursuant to the Eighth Amendment. If the petitioner prevails on this claim, he will clearly have shown himself ineligible for the death penalty.

The majority, however, suggests that McKenzie's claim of ineligibility for the death penalty does not constitute a claim of "innocence of the death penalty" under *Sawyer*. The Supreme Court's own jurisprudence with respect to the doctrine of retroactivity delineated in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), demonstrates that the term "innocence of the death penalty" is equally appropriate to describe a defendant who has been declared ineligible for such punishment based on facts arising after trial.

Under an exception to the *Teague* doctrine, courts may announce and apply new rules on collateral review that "prohibit[ ] a certain category of punishment for a class of defendants because of their status or offense." *Penry v. Lynaugh*, 492 U.S. 302, 330, 109 S.Ct. 2934, 2953, 106 L.Ed.2d 256 (1989). The Court in *Penry* explained that:

> In our view, a new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all. In both cases, the Constitution itself deprives the State of the power to impose a certain penalty, and the finality and comity concerns underlying Justice Harlan's view of retroactivity have little force.... Therefore, the first exception ... should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their *status* or offense.

*Penry v. Lynaugh*, 492 U.S. at 330, 109 S.Ct. at 2953 (emphasis added); *cf. Ford v. Wainwright*, 477 U.S. 399, 409–10, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (declaring a defendant who had become insane since his conviction ineligible for the death penalty on Eighth Amendment grounds).

Several courts have recognized that the justifications underlying this exception to *Teague* and those underlying the miscarriage of justice exception to *McCleskey* are indistinguishable in this respect. *See, e.g., Prihoda v. McCaughtry*, 910 F.2d 1379, 1385–86 (7th Cir.1990); *Sawyer v. Butler*, 881 F.2d 1273, 1293–94 (5th Cir.1989), *aff'd*, 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (*en banc*). Thus, even if the Order leaves the miscarriage of justice prong unviolated— which I do not believe is the case—it gives an entirely insufficient explanation why McKenzie, whose *Lackey* claim would render him ineligible for the death penalty, is not then entitled to relief on that basis.

### 3

In sum, the unprecedented extension of *Harris* to deny McKenzie a stay on the facts of this case is totally unwarranted. This is not a *Harris* case.

(1) McKenzie's habeas petition is not a last minute effort to stay an execution.

(2) It is also not an effort to stay an execution with an end run around habeas requirements by filing a § 1983 action, and perhaps most importantly of all

(3) McKenzie has a viable claim of miscarriage of justice. Harris did not. Harris' challenge to the method of execution could not have saved him from execution. He was not making a claim of innocence of the death penalty. McKenzie is making just such a claim.

### C

Even setting aside these problems, the record now available to us indicates that McKenzie had cause for not bringing this petition earlier and that this petition was not filed in an attempt to wrongly manipulate the judicial process. This can be seen by examining the reasons given by counsel for not bringing the *Lackey* and Ex Post Facto claims prior to the resetting of petitioner's execution date on March 27, 1995.

There is no authority that *Harris* erected a *per se* rule against considering petitions

filed near the time of execution.[5] Thus, the simple fact that McKenzie raised his *Lackey* claim for the first time six weeks before his execution, cannot be sufficient in itself to warrant the finding that the petitioner is engaging in any "last minute attempt to manipulate the judicial process." *Harris,* 503 U.S. at 654, 112 S.Ct. at 1653. The majority, however, has no other credible evidence of abusive behavior in this case.

The majority focuses on the petitioner's failure to bring his *Lackey* claim sooner than he did. Because the claim was "kicking around" in the 1980s, the majority finds, McKenzie should have raised it in his second petition filed in 1985 or in the years immediately following. The majority even goes so far to suggest that McKenzie should have raised this claim based on unconstitutional *delay* in his 1981 habeas petition, one year after his conviction became final in state court.

To support its factual finding, made without taking any evidence, that McKenzie's timing in raising this claim was a manipulative attempt to thwart the State's lawful right to execute him, the majority cites several earlier cases in which this type of claim had been considered. What the majority does not focus on, of course, is the fact that every single case cited involved a flat rejection of the claim that an Eighth Amendment violation could accrue based on delay. *See, e.g., Richmond v. Lewis,* 948 F.2d at 1491–92; *Chessman v. Dickson,* 275 F.2d 604, 607 (9th Cir.1960).

The facts in McKenzie's case make pellucid that the test implicitly adopted by the majority—under which a claim is manipulative if it is not brought the day after it was first raised by another lawyer anywhere in the country—is completely unworkable.[6] In any event, at oral argument McKenzie's counsel

presented strong reasons why he did not raise this claim earlier.

Until the recent events in *Lackey,* McKenzie had no plausible basis for bringing this claim. The nature of the claim prevented McKenzie from raising it until the delay had become substantial enough to raise constitutional questions. Thus, the State is surely wrong to suggest that McKenzie should have brought this claim in his first petition, when he had been on death row for only six years.

Moreover, once the delay reached a level of constitutional import, McKenzie still lacked any legal authority that supported the theory. In fact, in 1990, a panel of this court rejected this very claim and established as the law of this circuit that no such Eighth Amendment claim existed. *Richmond v. Lewis,* 948 F.2d 1473, 1491–92 (9th Cir.1990), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992), *vacated* 986 F.2d 1583 (1993). *Richmond* remained the law of this circuit, precluding any attempt by McKenzie to raise his unconstitutional delay claim, until the decision was vacated on March 17, 1993. The majority concedes that any attempt to argue this claim while *Richmond* was the law of the circuit would arguably be a frivolous action.[7] Order at 1464–65.

Despite this concession, the majority concludes that McKenzie could have raised this claim before 1990 or after 1993. Between 1985 and 1994, McKenzie's second habeas petition was pending in federal court. To comply with the mandate of the majority's Monday morning quarterbacking, McKenzie would have had to file a third habeas petition even while he had a previous petition pending and unresolved. And, while the order to vacate *Richmond* removed a formidable barrier to raising a *Lackey* claim after 1993,

---

5. Taken to the extreme, such a rule could be the basis for a court's denying a stay for even a first habeas petition if the court believed it was filed "too late," however subjectively a court might make such a determination.

6. In its attempt to avoid maligning McKenzie's counsel without affording him even the slightest due process, the majority includes a footnote assuring that it was drawing no inference from the fact that he had litigated the *Richmond* case.

The majority takes pains to explain that what they find "dispositive is that the claims were available to a lawyer of reasonable competence litigating death penalty cases in this circuit." Order at 1465 fn. 7.

7. Furthermore, neither party had noticed the 1993 order vacating *Richmond* until it was called to their attention at oral argument. *See* n. 4, *supra.*

there was still *no positive authority* upon which to base a new petition asserting unconstitutional delay.

The fact that the claim was not completely unheard of, and had been raised in three or four cases beside *Richmond* at the state or district court level, is not sufficient to show that counsel engaged in manipulative behavior in declining to bring it previously. The Supreme Court's cause and prejudice jurisprudence makes clear that counsel is not required to bring "all remotely plausible constitutional claims that could, some day, gain recognition." *Reed v. Ross*, 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984). If this were not the case, "counsel on appeal would be obliged to raise and argue every conceivable constitutional claim, no matter how far fetched, in order to preserve a right for post-conviction relief upon some future, unforeseen development in the law." *Id.* If it is sufficient under *McCleskey* to show that the petitioner did not raise a claim previously because there existed no legal authority for doing so, it must also be sufficient under *Harris* to show that a claim was not brought earlier for the same reason and was filed near the execution date only after some new authority developed in the shadow of the execution.

This is precisely the explanation counsel gives in this case. Counsel explained that he was prompted to raise the claim by the very recent developments in *Lackey*. The petitioner in *Lackey* raised an unconstitutional delay claim in state habeas proceedings. When that claim was denied by the Texas Supreme Court, the United States Supreme Court granted a stay of execution pending its decision on certiorari. *Lackey v. Texas*, —— U.S. ——, 115 S.Ct. 1274, 131 L.Ed.2d 192 (1995). Counsel explained that the granting of the stay led him to believe that the Court might grant certiorari and establish the Eighth Amendment claim Lackey was advancing. Thus, McKenzie raised his *Lackey* claim in state court at the hearing to reschedule McKenzie's execution on March 27, 1995. On that same day, the Supreme Court denied certiorari in *Lackey*, Justice Stevens' memorandum discussing the viability of the *Lackey* claim was issued, with Justice Breyer noting his agreement that the claim was "important and undecided." —— U.S. at ——, 115 S.Ct. at 1421. These published views of two Supreme Court Justices provided the first positive American authority available to support an unconstitutional delay claim.

McKenzie's explanation about why he did not raise his Ex Post Facto claim earlier is virtually irrefutable. In his habeas petition, McKenzie alleges that the 1981 amendments to § 95–2203, recodified at § 46–19–103, were applied to him for the first time when the state court rescheduled his execution on March 27, 1995. Petition at ¶ 15.5. The State does not controvert that the new version of the statute had never before been applied to McKenzie, but merely recites that the statute was "in effect" in 1982 when his execution was rescheduled for the seventh time.

In any event, because this case comes before us on a judgment of dismissal and because no facts were found below, we must accept McKenzie's allegation that the 1981 version of the statute was applied to him for the first time on March 27, 1995. McKenzie could not possibly have raised any objection to the retroactive application of the amended statute any sooner than at that hearing. Indeed, if McKenzie is correct that retroactive application of the amended statute is prohibited by the Ex Post Facto clause, he had every reason to believe that the State would comply with the Constitution and refrain from applying the statute retroactively.

Once the amended statute was applied to him, McKenzie immediately objected and commenced to exhaust his state remedies. There can be no question that McKenzie wasted no time in exhausting and then bringing his Ex Post Facto claim in federal court.

Thus, even if the majority harbors some doubt about whether McKenzie should have raised his *Lackey* claim at some point earlier, which I do not believe is warranted, there can be no doubt—without engaging in factfinding and disputing the pleadings before this court—that McKenzie could not have brought his Ex Post Facto claim even a day earlier than he did.

## IV

## The Stay Issue

Thus, it is clear that the sparse record before this court could not support the application of *Harris* to deny McKenzie the chance to have his petition properly considered by the district court. It is also clear that this court cannot reach the question of abuse of the writ on this appeal, given the state of the record. Thus, it would seem that we are obligated to reverse the district court's dismissal and remand for proper consideration of the abuse of the writ issue and, if necessary, the merits of the claims. This leaves the question of whether we should follow the lead of the Supreme Court in *Lackey* and stay the execution pending consideration of the petition by the district court on remand.

Once the inapplicability of *Harris* is resolved, the proper standard for granting a stay is set forth in *Barefoot v. Estelle*, 463 U.S. 880, 895, 103 S.Ct. 3383, 3395, 77 L.Ed.2d 1090 (1983): the stay should be granted only if the claim presents substantial grounds upon which relief might be granted. A habeas petition provides "substantial grounds" if it includes claims that are "debatable among jurists of reason" or are "adequate to deserve encouragement to proceed further." *Barefoot*, 463 U.S. at 893 n. 4, 103 S.Ct. at 3395 n. 4 (citations omitted). As will be discussed below, at least two of McKenzie's constitutional claims meet this standard.[8]

## V

## The Ex Post Facto Claim

At the March 27, 1995 hearing in the district court for the Eighth Judicial District of Montana, on the state's motion to reset his execution date, McKenzie requested that he be resentenced to life imprisonment without

the possibility of parole because a change of circumstances invalidated the reasons given by the original sentencing judge for imposing a sentence of death.[9] The trial judge declined to resentence him, citing section 46–19–103(1) which provides that:

> If execution has been stayed by any court and the date set for execution has passed prior to dissolution of the stay, the court in which the defendant was previously sentenced shall, upon dissolution of the stay, set a new date of execution for not less than 5 or more than 90 days from the day the date is set.

Act of Mar. 30, 1981, chap. 191, sec. 1, § 46–19–103(1), Mont.Laws, 266, 267.

McKenzie agrees that section 46–19–103(1) leaves no discretion to reconsider his death sentence, and that it, as the trial judge noted, effectively reduces the judge's duties at the proceeding to those of an ordinary desk clerk: to exercise his procedural and ministerial duty to set a convenient time and find a suitable place to execute McKenzie.[10] He argues, however, that the application of this statute, which was enacted six years after he was initially sentenced to death, violates the Ex Post Facto prohibition contained in Article I, section 10 of the United States Constitution.

He argues that the law in effect in 1975 vested in the state district court the discretion to resentence him if the state fails to execute him within 60 days after a death sentence is imposed. Thus, he contends that application of the statute, as amended in 1981, violated the Ex Post Facto Clause because it eliminated the discretion of the state trial judge to resentence him to life in prison without the possibility of parole, an option that became available in 1977. The majority flatly rejects this claim, interpreting the statute before it was amended in 1981 as denying the district court any discretion to resentence

---

8. While I focus on only two of McKenzie's claims due to the severe time constraints imposed here, I do not mean to imply that his other claims are meritless. I express no view on the merits of his other claims.

9. *See* discussion of these reasons, *supra* at p. 1471.

10. On appeal, the Montana Supreme Court affirmed the district judge, agreeing that section 46–19–103(1) could properly be applied to McKenzie and that it deprived the judge of any discretion to reconsider his sentence. *Montana v. McKenzie*, —— Mont. ——, 894 P.2d 289, 292 (1995).

a person once a death sentence has been imposed.

In making this argument, McKenzie relies first on established principles of Ex Post Facto law which prohibit retroactive application of a statutory provision that removes a judge's discretion to impose a lesser sentence. The majority agrees with McKenzie that *United States v. Paskow,* 11 F.3d 873, 877 (9th Cir.1993), makes it the law of our circuit that retroactive application of a statute removing the discretion to mitigate a sentence would violate these principles. *See* Order at 1469–70.

Where McKenzie and the majority part ways is in interpreting the statute in effect when McKenzie was originally sentenced. It provided that: "in pronouncing the sentence of death, the court shall set the date of execution which must not be less than 30 days nor more than 60 days from the date the sentence is pronounced." Former § 95–2303, R.C.M.1947. McKenzie argues that because this statute required that a person be executed within 60 days of the pronouncement of his death sentence, a failure to meet that deadline necessarily means that the outstanding death warrant expires and a sentence of death must be repronounced before the execution may be rescheduled. Otherwise, he argues, the 60 day time limit would be a nullity because a new execution date could be set and he could be executed more than 60 days after the time of pronouncement of his death sentence.

The State does not offer a contrary interpretation of the pre–1981 statute. What it does offer is the assertion that, at common law, execution dates were routinely scheduled by nonjudicial officers. *See, e.g., Schwab v. Berggren,* 143 U.S. 442, 451, 12 S.Ct. 525, 528, 36 L.Ed. 218 (1892). McKenzie's claim, however, does not turn on *who* may schedule an execution, but rather when an execution may be carried out after a death sentence is imposed. Thus, while the State may be correct that the a nonjudicial officer could *schedule* an execution under former section 95–2303, that does not inform the inquiry whether a death sentence lapses if not carried out within 60 days after it is pronounced.

The State also asserts that at common law, a lapsed execution date provided a prisoner with only temporary immunity from execution—until a new date may be designated to carry out his sentence. It provides no authority, however, that addresses the legal effect of an explicit statutory requirement that a death sentence be carried out within a specified time after it is pronounced. Again, the State overlooks the distinction between the discretionary act of imposing a death sentence and the ministerial act of scheduling the execution. Moreover, the State's recital of common law principles in answer to the question of statutory interpretation is not accompanied by even the barest assertion that the statute at issue was enacted in support of, rather than in derogation of the common law.

What we are left with, then, is the State's argument that *current* Montana law renders the duty of setting an execution date purely ministerial and deprives the court of any discretion to reconsider the sentence when it reschedules the execution. This argument neither contributes to our task of construing the pre–1981 statute, nor states anything beyond the obvious. Instead, this argument simply begs the crucial question whether pre–1981 Montana law permitted reconsideration of the sentence of death when the 60–day period expires. McKenzie, on the other hand, offers a plausible argument that it did.

Neither party cites any federal or state case law interpreting former § 95–230, and I have not uncovered any. The plain language of the statute, however, seems to support McKenzie's interpretation. To be sure, the statute is ambiguous on its face because it does not say what happens if an execution fails to take place within 60 days of pronouncement of execution. Presumably, however, the legislature had some purpose in mind in requiring that the execution be carried out within 60 days of pronouncement of the sentence. Moreover, there is a plausible explanation why the Montana legislature, in enacting § 95–2303, would have wanted to require that executions take place close in time to the pronouncement of the sentence: A penalty as severe and irreversible as death requires careful consideration of its appropri-

ateness close to the time of execution to ensure it remains a just sentence in light of circumstances that exist at the time the sentence is carried out.

Even though the State provides no contrary explanation as to the meaning of § 95–2303, the majority labels McKenzie's interpretation as "counterintuitive," and flatly rejects it. In reaching this conclusion, the majority argues that "McKenzie's execution was rescheduled a number of times before Montana amended its death penalty statute and *there is no evidence that he could have sought mitigation of his sentence at any of these proceedings.*" Order at 1469. The clear implication of this statement is that this court has reviewed the record of those proceedings. In fact, the record does not include any relevant documents and the majority has no evidence one way or the other whether McKenzie could have sought mitigation or whether he made such a request. Even the State does not make such an allegation about these prior proceedings.

Beyond unsupported appellate fact-finding, the majority cites only a single case to support its interpretation of former § 95–2303, *State v. Hanners*, 254 Mont. 524, 839 P.2d 1267 (1992), the relevance of which I cannot fathom. In *Hanners*, the Montana Supreme Court addressed the question whether a defendant convicted of possessing marijuana could ask for a reformation of a prison sentence to substitute a supervised release program for prison time. Ruling that a judge had no common law power to modify a valid sentence absent statutory authorization, the Montana court interpreted the statute under which Hanners was convicted as providing no such authorization. Even reading this case broadly, this holding does nothing more than return us to the question asked at the outset: whether *this* statute—§ 95–2303—authorized the state district court to reconsider a sentence of death if the 60–day period expires.

Finally, the majority suggests that the lack of authority interpreting this statute should somehow be weighed against McKenzie. The absence of relevant caselaw is not, of course, an indication that McKenzie's claim is untenable. Rather, the lack of caselaw may simply be a function of the fact that not a single person has been executed in Montana in 52 years, a fact that has all but foreclosed any opportunity for Montana courts to interpret and apply provisions relating to executions.

In sum, McKenzie's Ex Post Facto claim turns on how we interpret § 95–2303. If that statute is construed to give judges discretion to reconsider the death sentence when the execution is not carried out within 60 days, it is undisputed that the application of the statute as amended in 1981 to McKenzie would violate the Ex Post Facto Clause. I believe he presents a colorable claim that he suffered such a violation at his March 27, 1995 hearing.

# VI

## The Eighth Amendment Claim

McKenzie also argues that it would be cruel and unusual punishment in violation of the Eighth Amendment to execute him after he has spent twenty years on death row, a delay he attributes primarily to the actions and errors of the State of Montana. He relies primarily on Justice Stevens' memorandum respecting the denial of certiorari in *Lackey v. Texas*, —— U.S. at ——, 115 S.Ct. at 1421. In that case petitioner Lackey argued that executing a prisoner who has already spent seventeen years on death row would violate the Eighth Amendment's prohibition against cruel and unusual punishment—essentially the same argument raised here by McKenzie. *Id.* Justice Stevens stated that "[t]hough novel, petitioner's claim is not without foundation," and "[p]etitioner's claim, with its legal complexity and its potential for far-reaching consequences, seems an ideal example of one which would benefit from [ ] further study" by state and federal courts. *Id.* Justice Breyer noted his agreement with Justice Stevens that "the issue is an important undecided one." *Id.*

Though Justice Stevens did not, of course, rule on the merits of Lackey's claim, he did postulate that neither of the two proffered purposes of the death penalty—retribution

and deterrence [11]—"retains any force for prisoners who have spent some 17 years under a sentence of death." *id.; see, e.g., In re Medley,* 134 U.S. 160, 172, 10 S.Ct. 384, 388, 33 L.Ed. 835 (1890) ("[W]hen a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it. . . ."). Therefore, the execution of a prisoner who has spent such a protracted period of time on death row

> would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment.

*Furman v. Georgia,* 408 U.S. 238, 312, 92 S.Ct. 2726, 2763, 33 L.Ed.2d 346 (1972) (White, J., concurring in the judgment); *see also Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976) ("[T]he sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering.").

**11.** *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

**12.** The majority comments that two other prisoners with similar Eighth Amendment claims have been executed recently. Order at 1468 n. 16 (citing *Free v. Peters,* 50 F.3d 1362 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1397, 131 L.Ed.2d 247 (1995); *Williams v. Chrans,* 50 F.3d 1363 (7th Cir.1995)). However, the petition for certiorari was denied in *Free,* and he was executed, before Judge Stevens and Judge Breyer published their views on the Eighth Amendment claim and before the Court stayed Lackey's execution. I have no information at this time when Chrans was executed, but the record does show that he did not file a petition for certiorari with the Court.

**13.** For example, on direct appeal, the United States Supreme Court twice vacated the judgment of the Montana Supreme Court that the jury instructions comported with constitutional standards of due process. *State v. McKenzie,* 171 Mont. 278, 557 P.2d 1023 (1977), *vacated,* 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977), *on remand,* 177 Mont. 280, 581 P.2d 1205 (1978), *vacated,* 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d

Justice Stevens added that "[t]here may well be constitutional significance to the reasons for the various delays." *Lackey,* —— U.S. ——, 115 S.Ct. 1421. In particular, he suggested distinguishing among delays resulting from

> (a) a petitioner's abuse of the judicial system by escape or repetitive, frivolous filings; (b) a petitioner's legitimate exercise of his right to review; and (c) negligence or deliberate action by the State.

*Id.*

Justice Stevens' and Justice Breyer's views on the importance of this Eighth Amendment delay claim appear to have received the imprimatur of the Court when on April 27, 1995, it entered a stay of Lackey's execution "pending the district court's consideration of petitioner's petition for a writ of habeas corpus." *Lackey v. Scott,* —— U.S. ——, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995) (dismissal of writ of certiorari).[12] *See* note 1, *supra.*

The State does not contend that the delay in McKenzie's case is even remotely attributable to petitioner's "repetitive, frivolous," or otherwise illegitimate, filings, nor would such a contention be supported by the record. *See Appendix* (History of the McKenzie Case).[13] The State does not challenge

871 (1979), *on remand,* 186 Mont. 481, 608 P.2d 428 (1980), *cert. denied,* 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (1980). On its third consideration of this due process claim, the Montana Supreme Court admitted constitutional error, but nevertheless affirmed McKenzie's conviction by holding the constitutional violation harmless. *McKenzie,* 608 P.2d at 457–59. On collateral review, the State conceded constitutional error but continued to argue that it was harmless. In fact, at oral argument, the State of Montana admitted that the jury instructions "were in some respects the worst he had ever seen." *McKenzie v. Risley,* 842 F.2d 1525, 1544 (9th Cir.) (Fletcher, Pregerson, Canby, Norris, JJ., dissenting) (*en banc* ), *cert. denied,* 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988).

An *en banc* panel of this court affirmed McKenzie's conviction 7-to-4 on harmless error grounds. *Id.* at 1530–32. McKenzie's second federal habeas petition was based on evidence uncovered in 1985 that the prosecutor had an *ex parte* "McKenzie conference" with the sentencing judge before he sentenced McKenzie to death. The State stipulated that this petition was not an abuse of the writ. *See McKenzie v. McCormick,* 27 F.3d 1415, 1417 n. 3 (9th Cir. 1994), *cert denied,* —— U.S. ——, 115 S.Ct. 916,

McKenzie's contention that the Eighth Amendment may limit a state's power to execute a prisoner who has lived under a sentence of death and under extreme conditions of confinement for twenty years. Instead, the sole argument advanced by the State is that the State should be held responsible only for five years and nine months of McKenzie's twenty year delay because that was the time spent on direct appeal.[14] *See Appendix.* The State reasons that because a prisoner's decision to pursue collateral review is discretionary, the State cannot be held responsible for any delay beyond direct appeal. In so arguing, the State disregards Justice Stevens' suggestion that the relevant inquiry is not who is to blame for the delay, but whether the petitioner's claims were "a legitimate exercise of [his] right to review," or a "repetitive, frivolous filing[ ]." *Lackey v. Texas,* —— U.S. at ——, 115 S.Ct. at 1422 (Stevens, J. respecting denial of certiorari).

Even accepting the State's contention that it is necessary to assign blame for the delay in this case though it is undisputed that McKenzie's petitions have all been "a legitimate exercise of [his] right to review," it is beyond question that McKenzie's Eighth Amendment claim is "debatable among jurists of reason." *Barefoot v. Estelle,* 463 U.S. 880, 893 n. 4, 895, 103 S.Ct. 3383, 3395 n. 4, 3396, 77 L.Ed.2d 1090 (1983) (citations omitted). The State's argument only serves to create a major question of fact that an appellate court could not possibly begin to resolve at this stage of the proceedings. No record

has been developed below. The only thing before us are the contradictory allegations of the parties: McKenzie counters that the State should be held responsible for almost fifteen years of the delay due to, among other things, the State's refusal to hold necessary evidentiary hearings and its withholding of critical evidence. However this issue of fact is eventually decided (if it ever has to be decided), it in no way throws into doubt the viability of McKenzie's Eighth Amendment claim.

In fact, examining whether or not McKenzie's execution at this point in time would further the "two principal social purposes" identified by the Court as justifying capital punishment—retribution and deterrence, *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, Stevens, JJ.) (cited in *Lackey v. Texas,* —— U.S. at ——, 115 S.Ct. at 1422 (Stevens, J., respecting denial of certiorari)), it becomes clear that McKenzie presents a strong case. The years McKenzie has spent on death row appear to be unprecedented. This delay, coupled with the allegedly harsh and punitive confinement conditions on death row,[15] arguably satisfies the State's interest in exacting retribution.[16] Furthermore, the twenty years that have passed since McKenzie was sentenced to death, the repeal of the statute under which McKenzie was sentenced, the fact that no other person has ever been sentenced to death under that statute, and the fact that no

130 L.Ed.2d 797 (1995). After remanding the petition to the district court for an evidentiary hearing, our court denied the second petition on a divided vote. *Id.* at 1422.

**14.** *Accord Free v. Peters,* 50 F.3d 1362 (7th Cir. 1995) (attributing time spent on collateral review, as opposed to direct appeal, to the actions of the death row inmate), *cert. denied,* —— U.S. ——, 115 S.Ct. 1397, 131 L.Ed.2d 247 (1995). Note, however, that *Free* was decided almost a week before Justice Stevens' memorandum, *Lackey v. Texas,* —— U.S. ——, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995), and over a month before the Court issued a stay of Lackey's execution, *Lackey v. Scott,* —— U.S. ——, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995) (dismissal of certiorari). *Free* was executed on March 23, 1995.

**15.** The State does not respond to McKenzie's allegations that conditions at the Montana State Prison themselves fell below Eighth Amendment

standards. McKenzie cites to several lawsuits that have arisen as a result of the allegedly unconstitutional conditions. On December 1, 1994, the United States Government filed a suit alleging that inmates are denied adequate medical care, adequate security and protective measures, and are forced to endure conditions that endanger their lives and safety. Complaint, *United States v. Montana,* U.S.D.C.Mont. No. CV–94–90–H–CCL. McKenzie has a pending lawsuit for the longtime denial of medical care, *McKenzie v. Chisolm, et al.,* D.Mont. 92–67–H–CCL, and a class of inmates brought a suit which resulted in a settlement and consent decree in 1994, *Langfrod et al. v. Racicot,* U.S.D.C. No. CV–46–H–LBE.

**16.** *Lackey v. Texas,* —— U.S. at ——, 115 S.Ct. at 1422 (collecting cases).

one in Montana has been executed since 1943, all have arguably nullified the additional deterrent value of executing McKenzie at this point in time. *See Coleman v. Balkcom,* 451 U.S. 949, 952, 101 S.Ct. 2031, 2033, 68 L.Ed.2d 334 (1981) (Stevens, J., respecting denial of certiorari) ("The deterrent value of any punishment is, of course, related to the promptness with which it is inflicted.... [T]he deterrent value of incarceration during that period of uncertainty [on death row] may well be comparable to the consequences of the ultimate step itself.").

McKenzie's Eighth Amendment claim draws further strength from three recent decisions of foreign courts criticizing the American "death row phenomenon"—the protracted incarceration of condemned prisoners under a sentence of death in extreme conditions of confinement. These cases represent a growing recognition of the need to redress institutional failures that have resulted in an added dimension of punishment in capital cases that was unknown in historic times.

The most recent decision comes from the Privy Council of the British House of Lords, the highest court in England and the most authoritative interpreter of British common law. *Pratt & Morgan v. Attorney General for Jamaica,* 3 SLR 995, 2 AC 1, 4 All ER 769 (Privy Council 1993) (en banc). American Courts have long been guided by the decisions of the Privy Council.[17] Sitting *en banc* for the first time in fifty years, the Privy Council unanimously held that to execute two inmates who had been on death row for fourteen years and who had been read execution warrants on three occasions would constitute "torture or ... inhuman or degrading punishment" in violation of section 17(1) of the Jamaican Constitution, a document rooted in the English common law tradition. Slip op. at 13, 20. The Privy Council explained:

> There is an instinctive revulsion against the prospect of hanging a man after he has been held under sentence of death for many years. What gives rise to this instinctive revulsion? The answer can only be our humanity; we regard it as an inhuman act to keep a man facing the agony of execution over a long extended period of time.

*Id.* at 16. The Privy Council commuted the sentences of the two men to life imprisonment.

Though the decision did not involve an interpretation of the cruel and unusual punishment clause of the English Bill of Rights of 1689—the source of the Eighth Amendment of the U.S. Constitution[18]—McKenzie notes that the Privy Council did survey English common law and conclude that extended imprisonment on death row and the repeated setting of execution dates were not practices condoned historically at common law.[19] He further argues that such a conclusion strongly suggests that the cruel and unusual punishment clause of the 1689 Bill of Rights, and in turn the cruel and unusual punishment clause of our Eighth Amendment, would prohibit the execution of an

---

17. *See, e.g., United States v. Raddatz,* 447 U.S. 667, 679, 100 S.Ct. 2406, 2414, 65 L.Ed.2d 424 (1980) (citing Privy Council decision with approval); *Kilbourn v. Thompson,* 103 U.S. 168, 186, 26 L.Ed. 377 (1880) (same); *see also Fisher v. United States,* 328 U.S. 463, 486–88, 66 S.Ct. 1318, 1330, 90 L.Ed. 1382 (1946) (Frankfurter, J., dissenting) ("This Court in reviewing a conviction for murder ... ought not be behind ... the Privy Council....") (discussing Privy Council decisions).

18. *Harmelin v. Michigan,* 501 U.S. 957, 966, 111 S.Ct. 2680, 2686, 115 L.Ed.2d 836 (1991) (Scalia, J., concurring) ("There is no doubt" that Section 10 of the English Bill of Rights of 1689 "is the antecedent" of the cruel and unusual punishment clause of our Eighth Amendment).

19. *Pratt,* slip op. at 2 ("The death penalty in the United Kingdom has always been carried out expeditiously after sentence.... Delays in terms of years are unheard of."); *id.* at 3 ("It is difficult to envisage any circumstances in which in England a condemned man would have been kept in prison for years awaiting execution. But if such a situation had been brought to the attention of the court their Lordships do not doubt that the judges would have stayed the execution to enable the prerogative of mercy to be exercised and the sentence commuted to one of life imprisonment."); *id* at 5 (noting the "common law practice that execution followed as swiftly as practical after sentence.").

inmate who had been under a sentence of death for a protracted period of time.[20]

McKenzie also highlights another aspect of the Privy Council's decision—the assignation of fault for the delay of execution:

> [A] State that wishes to retain capital punishment must accept the responsibility of ensuring that execution follows as swiftly as practicable after sentence, allowing a reasonable time for appeal and consideration of reprieve. It is part of the human condition that a condemned man will take every opportunity to save his life through use of the appellate procedure. If the appellate procedure enables the prisoner to prolong the appellate hearings over a period of years, the fault is to be attributed to the appellate system that permits such delay and not to the prisoner who takes advantage of it.

*Id.* at 20.

The second of the foreign decisions relied on by McKenzie also comes from a court following the English common law tradition. In *Catholic Comm'n for Justice & Peace in Zimbabwe v. Attorney General*, No. S.C. 73 (Zimb. June 24, 1993) (reported in 14 Hum. Rts.L.J. 323 (1993)), the Supreme Court of Zimbabwe held that prolonged death row incarceration constituted "inhuman or degrading punishment" in violation of its constitution, and thus forbade the execution of four prisoners confined under death sentence for between 4⅕ to 6 years. Slip op. 9, 45–46. In reaching its decision, the Court considered such factors as the "physical conditions endured daily" on death row and "the mental anguish" of the condemned prisoners. *Id.* at 4–5.

Finally, McKenzie cites a decision by the European Commission on Human Rights to block the extradition from Europe to the United States of a man charged with capital murder in the State of Virginia. *Soering v. United Kingdom*, 11 Eur.Hum.Rts.Rep. 439 (1989). The Commission held that the protracted delays in carrying out death sentences in Virginia, which it averaged at 6–8 years, constituted inhuman and degrading punishment in violation of Article 3 of The European Human Rights Convention Charter, a provision that "enshrines one of the fundamental values of the democratic societies making up the Council of Europe." Slip op. at 26. The Commission based its decision in part on "the very long period of time spent on death row in such extreme conditions, with the ever present and mounting anguish of awaiting execution of the death penalty. . . ." *Id.* at 35.

In sum, it is simply beyond dispute that McKenzie's Eighth Amendment claim is substantial, important, and deserving of careful and thoughtful adjudication.[21]

The majority, however, remains skeptical, and through a misunderstanding of the nature of a *Lackey* claim and a general disregard for the law, manages to conclude that McKenzie's *Lackey* claim is "highly unlikely" to succeed. Order at 1467–68.

First, the majority grossly misconstrues the *Lackey* claim because it defines the claim exclusively in terms of the "*delay* in the imposition of the death penalty." Order at 1467 (emphasis added). The majority is simply wrong about this. Delay is only one component of the claim; the other essential component is ignored by the majority—the act of execution following the delay.[22]

---

**20.** *See Ford v. Wainwright*, 477 U.S. 399, 405, 106 S.Ct. 2595, 2599, 91 L.Ed.2d 335 (1986) ("There is now little room for doubt that the Eighth Amendment's ban on cruel and unusual punishment embraces, at a minimum, those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted"); *Riley v. Attorney General of Jamaica*, 1 AC 719, 3 All ER 469 (Privy Council 1983) (Lord Scarman, dissenting, joined by Lord Brightman) ("[T]here is a formidable case for suggesting that execution after inordinate delay would have infringed the prohibition against cruel and unusual punishment to be found in Section 10 of the Bill of Rights of

1689. . . ."), *majority opinion overruled by Pratt & Morgan v. Attorney General of Jamaica*, 2 AC 1, 4 All ER 769 (Privy Council 1993) (en banc).

**21.** Our opinion in *Richmond v. Lewis*, 948 F.2d 1473 (9th Cir.1990), *rev'd on other grounds*, — U.S. —, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992), rejecting a similar Eighth Amendment claim, has been vacated, 986 F.2d 1583 (9th Cir.1993), and is no longer the law of this circuit.

**22.** It is no surprise then that the majority is at a loss to understand why commutation of the death sentence would be, in fact, the appropriate reme-

This could not have been made clearer by Justice Stevens. He focuses on "the question whether *executing* a prisoner who has already spent some 17 years on death row violated the Eighth Amendment's prohibition against cruel and unusual punishment." *Lackey v. Texas,* — U.S. at ——, 115 S.Ct. at 1421 (emphasis added). In suggesting an answer to that question, Justice Stevens goes through part of the Eighth Amendment analysis set forth in *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976) (Stewart, Powell, Stevens, JJ.), that requires a sanction to have "penological justification" in order to survive an Eighth Amendment challenge. *Id.* at 183, 96 S.Ct. at 2929. Justice Stevens then posits that neither of the two proffered justifications of the death penalty—retribution and deterrence [23]—"retain[ ] any force for prisoners who have spent some 17 years under a sentence of death." *Lackey v. Texas,* — U.S. at ——, 115 S.Ct. at 1421.

As a result of its misunderstanding of the nature of a *Lackey* claim, the majority ignores the relevant "penological justification" analysis as laid out by Justice Stevens. In fact, the majority evaluates the merits of McKenzie's Eighth Amendment claim without engaging in any legal analysis whatsoever. Instead, the majority substitutes a policy lecture professing "fear" that sustaining McKenzie's claim will "wreak havoc with the orderly administration of the death penalty in this country ... [and] dramatically alter the calculus in granting stays of execution in the hundreds of death penalty cases now pending". Order at 1467. But what does this have to do with whether the Eighth Amendment's ban on cruel and unusual punishment will be violated if McKenzie is executed after spending twenty years on death row? Certainly the Supreme Court in *Brown v. Board of Ed.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), did not consider the inevitable—and certainly enormous—dislocation and administrative costs of desegregating the public schools when it decided that segregated schools violated the Equal Pro-

tection Clause of the Fourteenth Amendment.

Moreover, the majority abuses its judicial power by engaging in raw appellate fact-finding that has no basis in the record. The majority admits to as much when it assesses—based on its own "experience"—that the impact of the *Lackey* claim would be to "halt virtually all executions in the United States." Order at 1468–69 & n. 17. This is simply outrageous. No federal appellate judge sees a large enough sample of death penalty cases to make a reliable statistical assessment of how many death penalty cases would be affected by a ruling that it would violate the Eighth Amendment for the State of Montana to execute McKenzie.

Finally, the only "remedy" the majority doles out for this potential constitutional violation is the suggestion that persons sentenced to death "refuse to avail themselves of avenues of review." *Id.* at 1470 n. 21. In advocating that death row inmates forego opportunities to remedy constitutional violations that they may have suffered at trial and at sentencing in order to avoid suffering the additional constitutional violation of cruel and unusual punishment, the majority gives new meaning to the notion of "mockery of justice."

### Conclusion

The only just way to decide this appeal is to vacate the district court's order dismissing McKenzie's habeas petition, remand the case to the district court for further proceedings consistent with the due process requirements of *McCleskey,* and stay the execution pending the district court's consideration of McKenzie's habeas petition. Such a disposition would be in line with the Supreme Court's order staying Lackey's execution pending the district court's consideration of his habeas petition. To let McKenzie die while Lackey lives to pursue his virtually indistinguishable Eighth Amendment claim is the antithesis of justice.

dy for such a constitutional violation. *See* Order at 1467–68.

**23.** *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

## APPENDIX

### History of the McKenzie Case

#### A. *Direct Appeal: March, 1975–Dec., 1980*

In January of 1975, Mr. McKenzie was convicted by a jury of deliberate homicide and aggravated kidnapping. Intent was a major issue at trial since the defense argued that Mr. McKenzie was incapable of harboring the mental states required for conviction of these crimes due to mental disease or defect.

On March 3, 1975, Mr. McKenzie was sentenced to death. The sentencing judge gave two reasons for imposing capital punishment. First, he felt it was necessary for the protection of society. And second, if Mr. McKenzie was not given the death penalty, under Montana law he could be eligible for release in as little as seven years. The 1973 statute under which Mr. McKenzie was sentenced has since been repealed and revised. No one except Mr. McKenzie has ever been sentenced under this 1973 statute. No one has been executed in Montana since 1943; and no one in Montana's history has been confined awaiting execution longer than two years.

The Montana Supreme Court affirmed Mr. McKenzie's convictions and sentence over the objection of one dissenter. *State v. McKenzie,* 171 Mont. 278, 557 P.2d 1023 (1976). The Montana Supreme Court rejected, among other things, Mr. McKenzie's claim that the jury instructions unconstitutionally relieved the state of proving all elements of the crime beyond a reasonable doubt by shifting to Mr. McKenzie the burden of proving lack of intent. The challenged instructions—eight in total—were all variations of the instruction that "a person intends the ordinary consequences of his voluntary act" [1] and were under the headings "Proof of Mental State by Inference" or "Proof of Mental State by Presumption." *Id.,* 557 P.2d at 1043; *State v. McKenzie,* 177 Mont. 280, 581 P.2d 1205, 1220–21 (1978). At trial, even the prosecution had objected to the use of these

instructions, requesting that alternatives be used in their stead. *See McKenzie v. Risley,* 842 F.2d 1525, 1544 (9th Cir.1988) (Fletcher, Pregerson, Canby, Norris, JJ., dissenting).

The United States Supreme Court granted Mr. McKenzie's petition for a writ of certiorari, vacated the judgment, and remanded for further consideration of the constitutionality of the jury instructions in light of *Patterson v. New York,* 432 U.S. 197, 205–06, 97 S.Ct. 2319, 2324–25, 53 L.Ed.2d 281 (1977). *McKenzie v. Montana,* 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977).

On June 7, 1978, almost a year after remand, the Montana Supreme Court again upheld the constitutionality of the jury instructions and again affirmed Mr. McKenzie's conviction and sentence. *State v. McKenzie,* 177 Mont. 280, 581 P.2d 1205 (1978). A dissenting justice argued that "[t]he majority has effectively ruled that a brutal, heinous murder justifies the State of Montana in suspending the operation and application of the Constitutions of the State of Montana and of the United States of America." *Id.,* 581 P.2d at 1235 (Shea, J., dissenting).

On June 25, 1979, the United States Supreme Court again granted Mr. McKenzie's petition for writ of certiorari, again vacated the judgment of the Montana Supreme Court, and again remanded for further consideration of the jury instruction issue, this time in light of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). *McKenzie v. Montana,* 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d 871 (1979). In *Sandstrom,* the Court held that the very jury instruction that the Montana Supreme Court had twice declared constitutional in Mr. McKenzie's case, was in fact unconstitutional. 442 U.S. at 513–14, 524, 99 S.Ct. at 2453–54, 2459. The Court reasoned that the instruction violated the Fourteenth Amendment's requirement that the State prove every element of the offense charged by shifting to the defen-

---

1. For example, "Instruction 33 ... directed that if the jury found that [defendant] committed an illegal act on the victim, 'the law presumes that an unlawful act was done with an unlawful intent; that is, the law expressly directs you to reason from such unlawful act that the defendant

acted with an unlawful intent, or purpose.'" Jury Instructions *quoted in McKenzie v. Montana,* 449 U.S. 1050, 1051–52 n. 1, 101 S.Ct. 626, 628 n. 1, 66 L.Ed.2d 507 (1980) (Marshall, J., joined by Brennan, J., dissenting from denial of certiorari).

dant the burden of disproving the element of intent. *Id.* at 524, 99 S.Ct. at 2459.

On remand, the Montana Supreme Court accepted that the McKenzie jury had been instructed in violation of the Constitution, but nonetheless affirmed the conviction for the third time. *State v. McKenzie,* 186 Mont. 481, 608 P.2d 428, 457–59 (1980). The court held that the trial court's constitutional error in shifting to Mr. McKenzie the burden of disproving the element of intent was harmless because "the evidence on the issue of intent [was] overwhelming, uncontradicted, and permit[ted] but one rational conclusion." *Id.,* 608 P.2d at 458–59. Justice Shea, in dissent, argued that the majority's "overwhelming evidence test" could not be applied to unconstitutional jury instructions,[2] exclaiming, "[i]f what this Court has done in this case is any indiction of the attitude of most state courts toward federal constitutional rights, I can think of no more convincing reason for the United States Supreme Court to adopt a rule of automatic reversal." *Id.* at 465 (Shea, J. dissenting).

On December 12, 1980, the United States Supreme Court denied Mr. McKenzie's third petition for certiorari. *McKenzie v. Montana,* 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (1980).

### B. *First Petition for Habeas Corpus: Jan., 1981–Oct., 1988*

Mr. McKenzie immediately filed a petition for post-conviction relief in the Montana state district court. The petition was denied without a hearing on January 5, 1981. On October 29, 1981 the denial was affirmed by the Montana Supreme Court. *McKenzie v. Osborne,* 195 Mont. 26, 640 P.2d 368 (1981). In a 68–page dissent, Justice Shea stated, "Never in the annals of criminal history in this State has a defendant ever been the

victim of such a consistent and wholesale denial of fundamental rights. Only a federal court can now give the fair and even-handed review that the Court has so consistently refused to give." *Id.,* 640 P.2d at 434–35.

Less than two months later Mr. McKenzie filed a petition for writ of habeas corpus in federal district court based in part on the State of Montana's concession that the jury instructions were unconstitutional. The district court dismissed the petition in an unpublished order on August 16, 1985, over three and a half years after it was filed. On October 8, 1986, the Ninth Circuit affirmed the dismissal, agreeing with the Montana Supreme Court that the constitutional error was harmless. *McKenzie v. Risley,* 801 F.2d 1519 (9th Cir.1986). Following that decision, a majority of the nonrecused active judges voted to rehear the case *en banc.* *McKenzie v. Risley,* 815 F.2d 1323 (9th Cir.1987). At oral argument, counsel for the State admitted that the jury instructions "were in some respects the worst he had ever seen." *McKenzie v. Risley,* 842 F.2d 1525, 1544 (9th Cir.1988) (Fletcher, Pregerson, Canby, Norris, JJ., dissenting). The *en banc* court nevertheless affirmed the district court's dismissal of the habeas petition by a seven to four vote on the basis that the constitutional error was harmless. *Id.* at 1530–32. On October 11, 1988, the Supreme Court denied certiorari. *McKenzie v. McCormick,* 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988).

### C. *Second Petition for Habeas Corpus: Feb., 1985–Jan., 1995*

In 1985, as a result of discovery ordered pursuant to Mr. McKenzie's first habeas corpus petition, Mr. McKenzie's counsel learned for the first time that the lead prosecutor had a forty-five minute *ex parte* "McKenzie conference" with the sentencing judge after

---

**2.** Justice Shea explained:

    Any test for harmless error with relation to unconstitutional jury instructions must minimally involve a consideration of whether the jury was influenced by the unconstitutional instructions. Here, the majority has omitted this analysis.... If a jury is not required to follow the law as instructed by the trial court it is freed to decide the case on any basis it

chooses as long as the appellate court can, on appeal, make a determination that the verdict is supported by 'overwhelming evidence.' Obviously, if a jury does not have to follow the law, there is no need to give the law to the jury to follow. This approach has as its bedrock, an assumption that jury instructions are nothing more than window dressing.

608 P.2d at 466, 468.

Mr. McKenzie's conviction but prior to sentencing. The purpose of the meeting was to discuss the fee request of the private attorney who served as the prosecutor in Mr. McKenzie's case on a contract basis.

Based on this newly discovered evidence and on *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), which held that it was a denial of due process for a trial judge to impose the death penalty on the basis of information which was not disclosed, and which the defendant had no opportunity to deny or explain, Mr. McKenzie filed his second habeas petition in the Montana Supreme Court asserting, in part, that the *ex parte* meeting violated his constitutional rights. The Montana Supreme Court dismissed the petition without a hearing. *McKenzie v. Risley,* Mont.Sup.Ct. No. 85–80 (unpublished).

On June 27, 1985, Mr. McKenzie filed his second petition in federal district court. The State of Montana stipulated that this second petition was not an abuse of the writ because the facts giving rise to the petition had not been previously known by Mr. McKenzie or his counsel. *See McKenzie v. McCormick,* 27 F.3d 1415, 1417 n. 3 (9th Cir.1994). After hearing testimony from the prosecutor (the judge was unavailable as a witness at the time and later died), the district court granted the State's motion for summary judgment and dismissed Mr. McKenzie's petition in an unpublished order on March 3, 1987. The prosecutor testified that Mr. McKenzie's sentencing was not discussed, though he conceded that the meeting "may have" included discussions on the fact that the victim had been raped and tortured, on the sentiment of the local community about the case, and on Mr. McKenzie's psychiatric defenses, among other things. *See McKenzie v. Risley,* 915 F.2d 1396, 1397–98 (9th Cir.1990).

On appeal it was discovered that the record of the prosecutor's testimony regarding the *ex parte* meeting had been lost, and, three and a half years after the fact, the district judge had to reconstruct the record pursuant to Fed.R.App.P. 10(c). *McKenzie v. Risley,* 915 F.2d 1396, 1397 n. 3 (9th Cir.1990). After reviewing this reconstruct-

ed record, we reversed and remanded for an evidentiary hearing. *Id.* at 1398. We held that the district court applied the wrong legal standard when it required Mr. McKenzie to prove that his sentencing had in fact been discussed at the *ex parte* meeting. *Id.* Instead, we said that the district court should have inquired whether matters were discussed during the *ex parte* meeting that "did or could have influenced the judge in his sentencing decision." *Id.* (citing *United States v. Reese,* 775 F.2d 1066, 1077–78 (9th Cir.1985)).

The McKenzie prosecutor died before the district judge held its evidentiary hearing on remand. On November 13, 1992, two years after remand, and two recused judges later, the district court denied Mr. McKenzie's petition in an unpublished order. We affirmed this dismissal by a 2–1 vote. *McKenzie v. McCormick,* 27 F.3d 1415 (9th Cir.1994). Because of the dearth of evidence due to the delay in disclosure of the *ex parte* meeting and the delay in adjudicating the related constitutional claim, the outcome of the appeal turned on who would bear the burden of proving what happened at the *ex parte* meeting. The majority held that Mr. McKenzie bore this burden, *id.* at 1418–19; the dissent argued that the State of Montana bore the burden, *id.* at 1423 (Norris, J., dissenting). On January 17, 1995, the Supreme Court denied certiorari. *McKenzie v. Day,* —— U.S. ——, 115 S.Ct. 916, 130 L.Ed.2d 797 (1995).

### D.  *Current Proceedings*

On March 27, 1995, a Montana state district court issued a death warrant ordering that Mr. McKenzie be executed on May 10, 1995. That same day, Mr. McKenzie appealed his sentence to the Montana Supreme Court primarily on the grounds that (1) it was an ex post facto violation to reset his execution date under a 1981 statute never before applied to Mr. McKenzie limiting the judge's discretion in imposing a sentence other than death, and that (2) it would be cruel and unusual punishment to execute him after he has spent twenty years on death row as a result of the actions and errors of the State of Montana. On April 11, 1995 the Montana

Supreme Court dismissed the appeal in an order indicating that an opinion was to follow. The opinion, issued on April 20, 1995, held that the district court's order resetting the execution date was not an appealable order. Accordingly, it did not reach the merits of any of Mr. McKenzie's substantive claims.

Without the benefit of an opinion from the Montana Supreme Court, Mr. McKenzie filed his third habeas petition in federal district court on April 18, 1995. Two days later, on April 20, 1995 the district court dismissed the petition sua sponte in a one-sentence order stating the petition was "meritless as a successive and repetitive petition."

On April 24, 1995, Mr. McKenzie filed a Notice of Appeal and a request for a certificate of probable cause. We granted the certificate on April 26, 1995 and ordered an expedited briefing schedule. Oral argument was held on May 6, 1995.